UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

   -v-                                           :

                                S10 10 Cr. 228 (LTS)

DANIEL BONVENTRE,                 :
ANNETTE BONGIORNO,
JOANN CRUPI,                      :
     a/k/a "Jodi,"
JEROME O'HARA, and                :
GEORGE PEREZ,

                            :

          Defendants.

                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## SENTENCING SUBMISSION ON BEHALF OF THE UNITED STATES OF AMERICA


                                  PREET BHARARA
                                  United States Attorney
                                  Southern District of New York
                                  Attorney for the United States
                                      of America


MATTHEW L. SCHWARTZ
JOHN T. ZACH
RANDALL W. JACKSON
Assistant U.S. Attorneys
    – Of Counsel –

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................1

RELEVANT FACTS ............................................................................3

THE DEFENDANTS' INDIVIDUAL ROLES IN THE FRAUD ........................5

    A.  Daniel Bonventre ....................................................................6

        1.  Bonventre Was a Key Player in the Fraud ............................7

        2.  Bonventre's Objections to the PSR Are Contradicted
            by the Jury's Verdict ......................................................10

        3.  Bonventre Told Material Lies in His Testimony at Trial
            and Reiterated Those Lies in His Sentencing Submission .................14

    B.  Annette Bongiorno ................................................................18

        1.  Bongiorno Was an Instrumental Part of the Fraud ...........................19

        2.  Bongiorno Knew the IA Trades Were Fake .........................................21

        3.  Bongiorno Committed Perjury .............................................22

    C.  Joann Crupi ..........................................................................25

    D.  Jerome O'Hara and George Perez .....................................................28

        1.  O'Hara and Perez Were Knowingly Involved in the Fraud .................28

        2.  O'Hara and Perez Continue to Refuse to Accept Responsibility..........30

DISCUSSION ...................................................................................36

    A.  Application of the Sentencing Guidelines.................................................36

        1.  Loss Amount...............................................................39

            a.  The Actual Losses Were At Least Approximately $20 Billion........40

i

b. The Losses From the Ponzi Scheme Were Reasonably
Foreseeable to Each of the Five Defendants ...................................42

c. The Defendants Are All Responsible for At Least
$20 Billion in Losses ...........................................................................48

d. Even if the Defendants Are Responsible for Something
Less than the Full Loss Amount, They Are All Plainly
Responsible for More than $400 Million for
Guidelines Purposes...........................................................................50

2. Number of Victims .........................................................................................52

3. Sophisticated Means ......................................................................................56

4. Endangering Solvency or Financial Security of Victims ......................58

5. Registered Broker-Dealer/Investment Advisor ....................................59

6. Role in the Offense ........................................................................................63

a. Daniel Bonventre, Annette Bongiorno, and Joann Crupi ..............64

b. Jerome O'Hara and George Perez .....................................................66

7. Obstruction of Justice ...................................................................................69

a. Bongiorno and Bonventre's False Testimony ..................................71

b. Bongiorno and Crupi's False Proffers ..............................................72

c. O'Hara and Perez's Self-Addressed, Sealed Letters.......................73

8. The Court Should Not Depart From the Guidelines Range................75

B. The Defendants Should be Sentenced to Significant Terms
of Imprisonment ...........................................................................................79

1. The Nature and Circumstances of the Offense.....................................79

2. The History and Characteristics of the Defendants ............................83

3. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense ....................................................83

4. General and Specific Deterrence ..........................................84

5. The Kinds of Sentence and Sentencing Range Established................86

6. The Need to Avoid Unwarranted Sentencing Disparities...................93

    a. A Significant Term of Imprisonment is Consistent With Sentences in Other Ponzi Scheme Prosecutions...................93

    b. A Significant Term of Imprisonment – Certainly More Than the 10 Year Sentence Received by Peter Madoff – is Consistent with the Defendants' Culpability in this Case ............97

C. The Defendants Should Be Denied Bail Pending Appeal .........................103

CONCLUSION...................................................................106

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA      :

   -v-                     :

                                     S10 10 Cr. 228 (LTS)

DANIEL BONVENTRE,       :
ANNETTE BONGIORNO,
JOANN CRUPI,           :
     a/k/a "Jodi,"
JEROME O'HARA, and     :
GEORGE PEREZ,

                           :

           Defendants.

                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING SUBMISSION ON BEHALF OF THE
## UNITED STATES OF AMERICA

The Government respectfully submits this memorandum in advance of the

sentencings of Daniel Bonventre, Annette Bongiorno, Joann Crupi, a/k/a "Jodi,"

Jerome O'Hara, and George Perez (the "defendants"), presently scheduled for July

28, 29, and 30, 2014.

## PRELIMINARY STATEMENT

The defendants in this case were each convicted of willfully participating in

what may well be the largest financial fraud in the history of the world.  The

enormous scope of the fraud at Madoff Securities is measured not just by the

amount of money lost – although the billions upon billions of dollars lost make it

comfortably the single largest Ponzi scheme known.  But the fraud at Madoff

Securities was also virtually unprecedented in its temporal and geographic scope:  it

lasted for approximately 40 years, and victimized tens of thousands of investors

from more than 140 countries.  As Judge Chin noted when he sentenced Bernard Madoff, none of the other financial frauds prosecuted in this district "is comparable to this case in terms of the scope, duration and enormity of the fraud, and the degree of the betrayal."

For his role, Madoff accepted responsibility and was sentenced – at the age of 71 – to serve 150 years in federal prison.  To be sure, Madoff was the originator and prime mover of the fraud.  But the five defendants here, along with others, were the people who allowed Madoff's fraud to succeed as wildly as it did.  Annette Bongiorno and JoAnn Crupi, along with Frank DiPascali, selected the actual "investments" in client's accounts and therefore told the falsehoods that victims relied on most directly in making critical life decisions.  Jerome O'Hara and George Perez created the infrastructure of the fraud, including designing automated systems that allowed the fraud to multiply to a new and enormous degree, and who created sophisticated fake documents that fooled auditors and regulators who attempted to understand the business of Madoff Securities.  Daniel Bonventre concealed the income and existence of the unregistered investment advisory business by repeatedly falsifying the records of the firm.  Bonventre, Crupi, and Bongiorno also had personal responsibility for tracking (or reconciling) the cash activity in the so-called '703 account, which was at the very heart of the Ponzi scheme.  And when the scheme came dangerously close to running out of money, Bonventre repeatedly lied to banks to obtain loans to cover the shortfall.

2

Simply put, without Bonventre, Bongiorno, Crupi, O'Hara, and Perez, Madoff's scheme could not have been a success. For their active participation in the fraud, each profited handsomely. Although none will work in the securities industry again, and all will presumably forfeit their ill-gotten wealth, justice requires that each receive a significant prison sentence, commensurate with their active and long-standing role in the fraud. A significant term of imprisonment will serve the most important aims of sentencing: the punitive loss of liberty as a result of the nature of the defendants' crimes, which will send a powerful message of deterrence and consistency to others and provide some measure of comfort, if not closure, to the victims of this crime.

## RELEVANT FACTS[1]

The Government demonstrated, and the defense did not seriously dispute, that from at least the 1970s, Bernard L. Madoff Investment Securities ("Madoff Securities") operated its investment advisory business as a massive Ponzi scheme. The Madoff Securities fraud affected at least thousands of investors, defrauding them of at least tens of billions of dollars.

---

[1]    In this brief, references to "Tr." are to the trial transcript, and references to "GX" are to Government trial exhibits (copies of which can be provided and/or filed upon request). Citations to the defendants' sentencing submissions are the defendant's initials followed by "Mem." For example, references to "DB Mem." are to Daniel Bonventre's sentencing memorandum. Because several defendants chose to lodge their objections to the Pre-Sentence Investigation Report ("PSR") in the form of a separate letter to the Court – in some cases as an exhibit to the sentencing submission, and in other cases not – we cite those separately by referring explicitly to, for example, "Bonventre Objections to PSR."

To perpetrate the fraud for so long, Bernard L. Madoff and his co-conspirators went to great lengths to disguise their crimes. Among other things, they created numerous versions of fake trading and accounting records, including client account statements and trade confirmations. When trades were most egregiously back-dated, the firm maintained a supply of outdated stationary so that its forgeries always looked authentic. And when auditors, regulators, and clients asked to inspect the business, Madoff and his co-conspirators created bespoke versions of the fake records, specially designed to fool whoever was looking at them.

The fraud was able to last so long, and grow so big, in large part because of the actions of the five defendants. During the course of the trial, the Government proved that Daniel Bonventre – the firm's Director of Operations – helped orchestrate a massive accounting fraud that hid the existence and scope of the investment advisory business, and that allowed the firm's other, failing lines of business to be surreptitiously propped up by the proceeds of the fraud. Annette Bongiorno and Joann Crupi worked as supervisors in the investment advisory business, personally handling client accounts and helping to generate the fictitious trading data that was falsely presented to the firm's clients. Both women at various times also kept track of the Chase bank account through which the Ponzi scheme was run – known within the firm at times as "Annette's checkbook" or "Jodi's checkbook" – watching client money go in and out, with no transfers corresponding to the purchase or sale of securities. And Jerome O'Hara and George Perez programmed the investment advisory business's computers to generate the false

4

books and records, and devised more and more ingenious ways to fabricate all sorts of data to fool clients, regulators, and others.

There was no dispute that Madoff Securities was a massive fraud, and that the defendants participated in it over a period of decades. And the evidence also showed – overwhelmingly and repeatedly, in different ways, through witnesses, documents, and the defendants' own words – that all five defendants knew exactly what they were doing. For their roles in enabling this historic fraud, they should each receive significant prison sentences, as discussed further below.

## THE DEFENDANTS' INDIVIDUAL ROLES IN THE FRAUD

In response to the five sentencing submissions (and attendant objections to the individual PSRs), the Government addresses each of the defendants' offense conduct, including any relevant conduct by the defendant that constitutes obstruction of justice. The Government will not reiterate the offense conduct – with which the Court is already very familiar – outlined extensively in the Government's Memorandum of Law in Opposition to the Defendants' Post-Trial Motions ("Govt. Post-Trial Br."), filed on May 16, 2014, but incorporates that brief here by reference. That submission set forth in considerable detail the evidence at trial that supported the jury's verdict.

Below, the Government focuses on a theme that pervades the sentencing submissions of each of the defendants: their remarkable lack of contrition and acceptance of responsibility. A jury has found each of the defendants guilty of participating in the largest fraud in United State history, but one would not be able

to tell that from the defendant's sentencing submissions.  Bonventre claims to be an innocent victim with a "pure heart."  As does Crupi, O'Hara, and Perez.  Bongiorno takes a more nuanced approach, recognizing the meaning of the verdict, but debating the extent of her role in the fraud.

## A.    Daniel Bonventre

In his sentencing submission, Bonventre denies all responsibility for the crimes for which he was convicted at trial and continues, despite the evidence levied against him, to blame others for his own conduct.  The brazenness of Bonventre's recalcitrance is, perhaps, most clearly evidenced in a letter dated June 19, 2014, which he appends to his sentencing submission.  (DB Mem., Ex. 1).  In that letter, Bonventre claims that he is "now stuck with the idea that [he] was somehow involved in a massive fraud" and that he has "since [the collapse of Madoff Securities] read extensively on the subject of sociopaths" to try and "understand what happened."  (Bonventre Ltr. at 2).  Bonventre then goes on to claim that he (Bonventre) was the victim in this case and describes the various things he "was robbed of."  (*Id.*)

Among other things, Bonventre bemoans the "40 years" of his life in which, prior to the collapse of the firm, he claimed to have "achieved so much through [his] hard work and unending diligence."  (*Id.*)  Nowhere in the letter does he take any responsibility for his criminal actions, but instead blames Bernard Madoff, Frank DiPascali, and Enrica Cotellessa-Pitz, as well the Government, for his predicament.  (*Id.* at 3).  In short, Bonventre denies that he is guilty of any of the crimes the jury

convicted him of and, in his sentencing submission, he seeks to avoid responsibility and to lay responsibility for his own crimes on others.

Presumably following his cue, the letters in support of Bonventre are to the same effect. His wife, for example, writes that the jury "was not listening for the truth," (DB Mem., Exh. 2), while his sister writes that "the jurors may have been asleep at the wheel," and that the Government "alter[ed] facts to suit their agenda so that they may win a case," (*id.*, Exh. 4). One long-time friend of Bonventre's writes that he was "persecuted," (*id.*, Exh. 16), and another writes that the jury must have been "deaf and blind," (*id.*, Exh. 33).

The Court should reject Bonventre's self-serving claims, which are squarely at odds with the jury's verdict and the evidence, and sentence Bonventre in a manner consistent with his crucial role in the fraud

### 1.    Bonventre Was a Key Player in the Fraud

As the proof at trial established, far from being "an ordinary man who has strived to live his life with honor, with honesty, with love and with respect," (Bonventre Ltr. at 3), Bonventre was one of the core perpetrators of the massive fraud that took place at Madoff Securities. The evidence showed, among other things, that Bonventre was Madoff's close criminal confidante who assisted Madoff in mastering the production of fake DTC reports, structuring the theft of hundreds of millions of dollars in funds from the Chase '703 account into the proprietary trading and market making businesses, and participating directly in a massive tax fraud (both on behalf of himself and on behalf of Madoff). In return for all of this

essential work in connection with the fraud, Bonventre received over $15,000,000 in income from salary, bogus trades that he directed into his investment advisory account, and other perks kept off the books. (GX 2000-35).

Bonventre's crucial role in the fraud played out in many different ways. One vivid example is the fake DTC reports that Bonventre, O'Hara, Madoff, and others worked to perfect. In the late 1990s, after much work had been done on these fake reports (which made it look like billions of dollars in securities were being held at the DTC on behalf of Madoff Securities), a finished version was finally produced. At that time, Madoff and Bonventre came into DiPascali's work area on the 17th floor. (Tr. at 4769-70). In front of Bonventre, DiPascali, and others, Madoff lifted the fake version of the report up to the window and compared it to a real DTC report. As Bonventre and Madoff stood in the 17th floor work area, "they were looking at it [the fake DTC report] in a light and remarking how great it was." (Tr. at 4770).

That moment revealed one of Bonventre's significant contributions to the fraud: his working knowledge of the paperwork and procedures used in the securities industry. Bonventre advised on how to make thinks appear realistic. Not only the DTC reports described above, but also later versions of these types of reports that sprouted up as technology advanced and which were used to trick auditors. (*See* Tr. at 5362-54; GX 4000-f2, at 2).

Bonventre also advised on other reports that were needed to deceive the auditors. As part of training DiPascali to fool representatives from KPMG, Bonventre joked about a document known as an "exception report," which was a

8

back office document reflecting a mismatch between information in the firm's internal records and information received from external sources verifying a trade, such as the DTC.  (Tr. at 5163-64).  The gist of the joke was that "none of [the investment advisory business transactions] will ever appear on [an] exception report" because "they actually never existed."  (*Id.*)

Bonventre also was a principal architect of the various methods used to steal money from the Chase '703 account to prop up the failing market making and proprietary trading businesses.  In total, over $799 million in customer funds were stolen from the Chase '703 account for these purposes.  (GX 5000-1, at pp. 142, 143).  Various meetings were held to work through these methods of transfer.  (Tr. at 3689).  As Cotellessa-Pitz explained, "at one point we were putting it into individual securities.  We had been taking the money over as interest, and Bernie decided he wanted to change it.  And we started taking it into individual securities as commission on individual stocks, and then it changed into going into one symbol, COMEQ, and then eventually into commission income."  (*Id.*)

Likewise, DiPascali testified that he was involved in discussions with Bonventre, Madoff, Cotellessa-Pitz, and Crupi about how to effectuate the transfers.  (Tr. at 5113).  This core component of the fraud, whereby almost $800 million of customer money was stolen, would not have been possible without Bonventre's expertise.  Nor, as described briefly below, would the massive tax fraud, both for himself and Madoff, been possible.

### 2.   Bonventre's Objections to the PSR Are Contradicted by the Jury's Verdict

In connection with sentencing, Bonventre submitted over six pages of objections to the Probation Office.  Even a cursory review of those objections demonstrates a clear lack of respect for the jury's findings, and many of them border on being disingenuous.  Indeed, with respect to many of the objections lodged by Bonventre, he is disputing the actual verdict rendered by the jury in this case.  At this juncture in the proceedings, there is no basis for making such objections.  The verdict was rendered and Bonventre was found guilty of all counts that went to the jury.  Below, the Government briefly points out some of the more egregious objections in Bonventre's letter to Probation.  The point here is not just to rebut the factual inaccuracies proffered by Bonventre, but to highlight Bonventre's lack of remorse and utter failure to take any responsibility for his own actions.

Typical of Bonventre's attitude is his objection to paragraph 60 of the PSR.  There, he claims that "there is no evidence that Mr. Bonventre knew the investment advisory client funds were not being invested as promised."  (Bonventre Objections to PSR at 2).  To begin with, Bonventre was convicted of Counts One and Six of the Indictment, which charged him with conspiring to commit, and actually committing, securities fraud on the investors of Madoff Securities.  (S10 Indictment, at ¶¶ 1-33, 46-47).  Simply put, those counts charged the very thing Bonventre claims there is no evidence of:  that Bonventre knowingly participated in a conspiracy to lie to the investment advisory business customers about their investments.  The evidence

10

presented at trial establishing the fact that Bonventre played an integral role in churning out the lies told to investors, including his participation in the manufacturing of fake DTC reports to make the investment advisory trading appear legitimate, (Tr. at 4769-70), his own instructions to Annette Bongiorno to put fake trades in his account, (*see* GX 105-b24, at 4), and an explicit conversation he had with DiPascali concerning the cover story he would give for the fake trading in the investment advisory business when the fraud inevitably collapsed.

In that conversation, which took place shortly after DiPascali walked in on a discussion between Bonventre and Madoff about O'Hara and Perez, Bonventre went over the cover story he was going to provide if the fraud collapsed, namely that "it was always explained to him that these trades were happening in Europe and that he was told to mind his own business." (Tr. at 5302). Upon hearing that proposed cover story, DiPascali responded to Bonventre that he (DiPascali) "wish[ed] [he] had an explanation" to give to the authorities, but he was resigned that he did not have one that would pass muster. (*Id.*) DiPascali then told Bonventre that if his (Bonventre's) explanation "works for [him], that's a good thing." (*Id.*).

Combine these examples with the numerous lies that Bonventre told the SEC and the employees of AlixPartners after the collapse of the firm – about his involvement with the Chase '703 account and the trading in his own IA account – it is no surprise that the jury found Bonventre guilty of lying to Madoff investors. In short, the evidence is clear that Bonventre was fully aware that the trades in the investment advisory business were not happening.

Similarly, in response to the Probation Office's summary of Bonventre's role in the tax fraud related to Madoff Securities, Bonventre claims that "[t]he evidence did not establish that Mr. Bonventre did anything with regard to audits of Mr. Madoff's personal taxes other than perform calculations at his direction." (Bonventre Objections to PSR at 3). Again, the jury found Bonventre guilty of the exact conduct he here denies – participating in efforts to deceive the IRS in connection with Madoff's personal tax returns. (S10 Indictment at ¶¶ 42-43 (Count Six: Conspiracy to Commit Tax Fraud)). As the Government set forth in its Post-Trial Brief, at pages 103 to 108, there was ample proof of Bonventre's knowing participation in this tax fraud. Among other things, Enrica Cotellessa-Pitz testified that she worked directly with Bonventre in carrying out this massive tax fraud. (Tr. 3781-83). Numerous documents showed Bonventre's manipulation of the books and records to accomplish this fraud. (*See, e.g.,* Tr. at 2988-90). Bonventre's self-serving denial of any role in this activity is not supported by the record and it flies in the face of the jury's clear verdict on this point.

Then there is Bonventre's claim that, contrary to what is set forth in paragraphs 76-78 of the PSR, Bonventre "did not know that fake trades were made in his account, and instead believed Mr. Madoff who told him that the trades were real." (Bonventre Objections to PSR at 3). As described above, that claim is wholly inconsistent with the jury's verdict that Bonventre was guilty of lying to the investors of Madoff Securities. He well knew – because he directed it – that the trading in those accounts was fake. Indeed, it was Bonventre himself who

12

handwrote a note to Bongiorno requesting a backdated trade that would minimize his taxes. (GX 105-b24, at 4 ("As per our phone conversation, I need a long term capital gain of $449000 on an investment of $129000 for a sale proceed of $578000")). Such a trade would necessarily have to be backdated and, when Bonventre received it, it was. (*See* GX 2000-91).

The last example the Government will point out is Bonventre's objection to paragraph 94 of the PSR, which summarizes Bonventre's personal tax fraud. (Bonventre Objections to PSR at 4). Bonventre there claims that he "did not have the requisite intent to file false returns because of his arrangement with and reliance on representations made to him by Mr. Madoff." (*Id.*) Again, this is conduct of which he was convicted at trial. The Government presented evidence of this tax fraud demonstrating that he failed to report almost $4.5 million in gross income from 1992 through 2008. A summary of the proof relating to this tax fraud is set forth at pages 98 through 103 of the Government's Post-Trial Brief.

But, one point stands out. On cross examination, Bonventre was pressed on the hundreds of thousands of dollars of purported gifts that he received from Madoff. (Tr. at 9977). Bonventre conceded that those were not gifts based on friendship, but were instead repayment for his employment at Madoff Securities. (Tr. at 9978). In that rare moment of candor from Bonventre, he admitted that these payments were not some token of friendship, but rather payments from his boss relating to his employment. There is another word for that: income. Income on which he knew he should have paid taxes.

13

In sum, at sentencing, Bonventre continues to reject the jury's verdict and remains defiant of the proof presented against him and unrepentant for the harm that he has caused thousands of victims across the globe. The position that he has taken with respect to his own criminal conduct is arrogant and disingenuous. The Government respectfully submits that – consistent with the need for criminal sentences to promote respect for the law – Bonventre's hubris should be factored into the sentence that the Court imposes on him.

### 3. Bonventre Told Material Lies in His Testimony at Trial and Reiterated Those Lies in His Sentencing Submission

In both his objections to the PSR and his sentencing submission, Bonventre contends that he should not receive additional points under the Guidelines for obstruction of justice related to his testimony at trial. The Government strongly disagrees. Bonventre told material lies to the jury, under oath, when he took the stand. He continues to perpetrate those lies in his letter to the Court in connection with sentencing.

Even a quick review of the trial transcript reveals that Bonventre peppered his testimony with material falsehoods. At his most expansive, Bonventre denied knowing that there was fraud anywhere at Madoff Securities prior to Madoff's arrest in December 2008. (Tr. at 9743). As Bonventre waded into the details, he testified that the Government's cooperating witnesses had not told the truth and that senior AlixPartners employees had testified incorrectly. With respect to both the broad issues presented by this case (knowledge, intent, etc.) and in the day to

day details (conversations, meetings, etc.), Bonventre's direct examination

amounted to well-crafted and rehearsed perjury.  Among other things, Bonventre

made the following false statements to the jury:

- Madoff told Bonventre that the investment advisory trades were executed in Europe and Bonventre *believed* that explanation to be true, (Tr. at 9522-24);

- During the 40 years that he worked at Madoff Securities, it never dawned on him that Madoff was running a fraud at Madoff Securities, (Tr. at 9528);

- All of the incriminating conversations that DiPascali testified about between himself and Bonventre were not true and were, instead, fabrications, (*see* Tr. at 9544-45, 9577);

- Claimed that he had no knowledge of anything being wrong with the audits of the broker dealer business at Madoff Securities, (Tr. at 9558);

- Denied any wrongdoing in connection with his work on Madoff's personal tax returns or any knowledge that fraud was occurring with respect to those returns, (Tr. at 9592);

- Denied hearing Madoff say "you all know what we do here" in a meeting with Madoff, Enrica Cotellessa-Pitz, himself and others; offered a different version of the story in which something similar was said, but he was not present or incriminated, (Tr. at 9627-28);

- Claimed that he never knew that the trades in the IA business were fake, (Tr. at 9630-31);

- Denied telling William Kingsford that he had a concerns about Madoff Securities when he closed his account in 2006, (Tr. at 9663);

- Claimed the check he wrote to Madoff which was then deposited into Bonventre's own Cohmad account was caused by "a breakdown in the [banking] system somewhere," (Tr. at 9690); and

15

- Claimed that he never agreed to violate the law with anyone at Madoff Securities, (Tr. at 9743).

Just these examples show the length to which Bonventre went to deceive the jury. He directly contradicted the testimony of the three Government witnesses claiming, either explicitly or implicitly, that they were either lying or mistaken.

The jury's verdict makes clear whom they believed was lying: Bonventre. Those lies were brazen and calibrated to weave a desperate path through the evidence against him.  Indeed, at one point, Bonventre offered an explanation for all of the unreported fringe benefits he received from Madoff Securities, claiming that he had actually paid Madoff back for years upon years.  Bonventre asserted that he had written Madoff a check at the end of every year until the early 2000s.  He then explained that for 2003 he and Madoff "were even money-wise," so he did not pay anything that year.  (Tr. at 9692).  Bonventre then claimed to have paid Madoff for business expenses in 2004, but that, going forward, he was unable to "get him [Madoff] to sit down and have that discussion" about reimbursing the  firm for expenses.  (Tr. at 9693).   Bonventre further explained that he looked for the checks for the prior reimbursements, but bank records only went back to 2003 (or, in some cases, 2002), (Tr. at 9691), so there was no way to show those prior repayments; they were lost to history.  What Bonventre did have were three checks (and only three checks) for all those years and, of course, one of those was memorably deposited right into Bonventre's own Cohmad account, though he (implausibly) denied any knowledge of that.  (Tr. at 9690).  Bonventre plainly crafted this lie –

16

which was plainly rejected by the jury its verdict convicting him of tax fraud –
because he knew it could not be directly refuted with documentary evidence.

Similarly, at another point, Bonventre claimed that his son, Daniel Max
Bonventre, had been hired as a social media consultant to the firm.  (*See* Tr. at
9705, 9715-17).  Conveniently for Bonventre, the only other party to that purported
arrangement – which was not documented anywhere – is dead.

These attempts failed.  Bonventre was convicted and the Court should
consider his perjury, both under the Sentencing Guidelines and in is evaluation of
Bonventre under the Section 3553(a) factors.  It should also be noted that, as
discussed above, Bonventre continues to deny any knowing participation in the
fraud.  He has lodged numerous objections to the PSR that directly contradict the
jury's verdict and he submitted a letter filled with similar lies.

*     *     *

In sum, Bonventre crafted many of the numerous lies told to Madoff's
customers.  He lied to the IRS and the SEC.  He lied to the jury and now he is lying
to the Court at sentencing.  Bonventre's hubris and lack of remorse is simply
staggering.  Because of his conduct, and his refusal, even at the very end of the case,
to accept responsibility, the Government respectfully submits that a very
substantial sentence is appropriate for Bonventre.  As we explain below, although
we do not believe that a sentence within the Guidelines range is necessary, we do
believe the sentence should be significantly greater than the 20-year sentence
recommended by the Probation Office.  We believe such a sentence is appropriate in

17

light of all of the relevant sentencing factors and the history of sentences imposed under reasonably analogous circumstances.

**B.     Annette Bongiorno**

In contrast to the defiant tone taken by Bonventre, Bongiorno, for sentencing purposes, at least "accept[s] that [she] has been convicted of participating in the largest securities fraud in history" and that her sentencing guidelines range is "life." (AB Mem., at 1).  Bongiorno spends the bulk of her submission focusing on the numerous letters submitted by friends and relatives on her behalf.

With respect to her role at Madoff Securities, Bongiorno accepts the leadership enhancement imposed by Probation but notes that "the proof at trial demonstrated that she had very limited discretion in carrying out her duties at Madoff Securities." (*Id*. at 12).  Bongiorno then goes on to argue that she had almost no discretion in her job at Madoff Securities and that she was simply following orders from Madoff, David Kugel, or Frank DiPascali.  (*Id*. at 13).  In short, Bongiorno, with some finesse, notes that her "role was concededly important for the fraud's success," but that "she is less culpable in many respects than Mr. DiPascali and Mr. Kugel, who invented phony trades and directed their entry into the customers' statements." (*Id*. at 14).  The Government disagrees.  In the Government's estimation, Bongiorno is roughly on a par with DiPascali in terms of the criminal conduct.  Of course, even now, Bongiorno has not accepted responsibility for her crimes.

1. **Bongiorno Was an Instrumental Part of the Fraud**

Whatever marginal distinction Bongiorno is making between herself and DiPascali or Kugel, it is, in the scope of the fraud, not particularly meaningful. For decades, Bongiorno knowingly generating false documents to deceive the customers of Madoff Securities. Those bogus documents reflected billions of dollars in fake trades. The evidence was clear that *both* Bongiorno and DiPascali (and, to a lesser extent, Crupi) were the managers of the fraudulent investment advisory business. (Tr. at 4260; GX 4000-f4 at 29 & 67 (Madoff internal roster indicating Bongiorno was a department head with thirteen employees under her)). Kugel was a more peripheral played, whose principal role in the fraud was to supply market knowledge to allow Bongiorno to create sophisticated and realistic fake trades.

But there is no dispute that Bongiorno operated at the heart of the fraud from near its inception. And, following orders or not, Bongiorno's incredible wealth and lifestyle were generated off the back of the fraud. As a result of her lengthy tenure at the core of the fraud, she earned far more than DiPascali, Crupi or Kugel – taking in, from the late 1970s until 2008, over $18,000,000 from Madoff Securities. (*See* GX 2000-81; Tr. at 7676-77). In addition, she and her husband maintained various investment advisory accounts, maintained by Bongiorno herself, whose purported value reached heights in excess of $60,000,000. (*See* GX 2000-88; Tr. at 7678-79).

Bongiorno's role, as established at trial, was far more proactive than the passive depiction of her involvement set forth in her sentencing papers. Bongiorno

was not, as her sentencing papers suggest, and as she portrayed herself in her testimony at trial, some thoughtless robot that did Madoff's bidding. Instead, she was a competent and demanding manager that oversaw numerous employees at the firm and was able to properly run large aspects of the fraud for decades. After all, the longevity of the fraud, where millions of pages of false account statements and trade confirmations were sent out over decades, without anyone catching on, demonstrates just how good Bongiorno was at her job. There were countless fake trades listed on those statements that amounted to billions and billions of dollars in purported value.

This is not to say that Madoff was not her boss – he obviously was. But the amount of detail and revisions required for Bongiorno to prepare the false documents shows a substantial amount of autonomy on her part. Bongiorno was largely self-directed, often making up the thousands of transactions in her clients' accounts and instructing her staff to research possible trades. Her own notes make this point. For example, one note reflected that she had the freedom to create $125 million in fake trades, with the only guidance being that she should pick eight winners and three losers. (GX 105-b44, at 2 (note in Bongiorno's handwriting, reading: "Use 125 mil to put up trading with 51 mil in gains. 11 – stks 3 are losses 8 – gains net 51 mil gains. No margins.")). Indeed, Madoff was absent from the office for months on end, including when he was at sea or vacationing in the South of France. It is simply not plausible, as Bongiorno tells it, that Madoff literally selected every stock, date, price, and volume. To the contrary, David Kugel testified

that with respect to the false convertible arbitrage trades, Bongiorno supplied that information and Madoff was not involved at all.  (Tr. at 1808-09).

Bongiorno also took a leading role in the Avellino & Bienes crisis and personally managed some of Madoff's largest clients, many of  whom benefitted most from the fraud.  Even a cursory review of the documents related to Avellino & Bienes and the various Picower accounts shows thousands of transactions, many in Bongiorno's own handwriting.  There is no countervailing set of Madoff handwritten documents showing that he was the one actually supplying the trading information. For example, Madoff certainly did not produce the sheet of paper, in Bongiorno's handwriting, that tracked random numbers inserted into backdated account statements.  (*See* GX 105-b59; GX 105-b62, at 13).

## 2.    Bongiorno Knew the IA Trades Were Fake

Bongiorno, like the other defendants, claims that she "[a]t all times . . . believed that the clients' funds were being invested in the stocks shown on their account statements."  (Bongiorno Objection to PSR ¶ 59).  Her assertion is that she was simply doing what Madoff told her to do and she believed that all of the trading was in fact real.  Again, as with Bonventre, this is belied by the fact that Bongiorno was convicted of defrauding Madoff Securities' clients (Counts One and Six), and that, as just discussed, she herself frequently fabricated the trading in clients' accounts.

Given that Bongiorno was not (and never claimed to be) executing trades in the stock markets, it is not clear how she could believe that trades she made up –

often through an extensive trial and error process, documented in thousands of pages of her own notes – could have actually existed. This was made even more plain when Bongiorno admitted that she backdated trades in Lehman Brothers after the investment bank had declared bankruptcy. (Tr. at 10545-48). That was plainly impossible and there was no plausible way she could have believed those trades to have been real.

Finally, and briefly, we address Bongiorno's claim that "there is every reason to believe that [she] was convicted by the jury on [a conscious avoidance] theory of guilt" and that that dictates a lower sentence in this case. (AB Mem. at 16). Given Bongiorno's managerial role in the fraud, her perjury at trial (discussed below), and the fact that she was convicted of conspiracy, in which conscious avoidance plays an extremely small role, this is not a plausible basis for reducing Bongiorno's culpability.

### 3.    Bongiorno Committed Perjury

Bongiorno testified at trial and much of what she said was simply not true. Put another way, the jury plainly rejected her testimony through its verdict and did not credit her claims of unknowing innocence.

Among the numerous material lies that Bongiorno asserted at trial were that she never intended to participate in a crime during her 20 years at Madoff Securities. (Tr. at 10174, 10381). She went on to claim that she never had an understanding that Madoff was committing a fraud during her tenure at the firm,

(*id.*), and that she never believed that she was preparing false account statements, (Tr. at 10174).

Throughout her testimony, Bongiorno repeatedly attempted to cast blame for any intentional fraud that occurred at the firm on Madoff, DiPascali, and others. A good example of this came on her direct examination. She was asked whether, during the Avellino & Bienes crisis, she was ever told that the point of the exercise was to ultimately deceive the SEC. She responded that "Bernie only told me what Bernie needed to tell me to get me to do my job. He didn't explain things like that to me. I wouldn't have understood it if he did explain it, but he didn't explain it." (Tr. at 10306). This was, in a nutshell, her defense. Madoff told her what to do and, to the extent that it was criminal, she was not sophisticated enough to comprehend what she was doing.

That defense, reiterated time and time again, reached its ridiculous apex when Bongiorno was shown a document reflecting calculations for a backdated trade. (GX 105-b338, at p.11). Seeing that the document appeared slanted, and notwithstanding the Government's apologies for not doing "a very good of photocopying" it, Bongiorno immediately claimed that she had been taking information down while on the phone, presumably with Madoff or a major client, and "that's why it's like a little off." Bongiorno claimed to remember that precise piece of paper, crooked writing and all. (Tr. at 10525 ("I remember it, and I remember thinking all these lines are crooked.")). As it turned out, the paper was just photocopied incorrectly, (Tr. at 10528), and Bongiorno's reflexive and desperate

perjurious refrain that she was simply following verbatim instructions from someone else was demonstrated to be not credible.

Similarly, when she was confronted with older Madoff Securities stationary that was used to make backdated trades look real, Bongiorno immediately recognized the problem it presented for her and tried to shift the blame. Bongiorno was asked whether she "kept old stationary to make it look like trades happened in the past when they really didn't." (Tr. at 10541). She responded, "I think *they* did." (*Id.* (emphasis supplied)). There was no escaping the improper use of the form: a trade confirmation slip should be sent out when the trade happens. So, when she claimed "they" must have kept the old versions "to make it look like trades happened in the past when they really didn't," she was trying to shift the blame to others, likely Madoff or DiPascali. The problem was that this ruse of using old confirmation slips was utilized by Bongiorno herself when she put together the Big Lots trade for Bonventre's account. (*See* GX 5000-1, at 99). The truth of the matter is that Bongiorno, by virtue of overseeing the investment advisory business for decades, knew exactly how all of the paperwork ruses (backdated account statements, revised account statements, STMTPro statements, etc.) worked, and that the trades were not real.

*    *    *

For decades, Bongiorno was the manager operating the fraud. Billions and billions of dollars in fake trades were printed on bogus account statements and sent to customers. Of all of the defendants in this case, it was Bongiorno that profited

24

the most from the fraud.  She brazenly lied on the stand and she still, to this day, refuses to accept responsibility for major portions of her conduct.  In the Government's view, the severity of Bongiorno's conduct is roughly on par with Bonventre's.  Thus, the Government submits that, like Bonventre, a sentence substantially more severe than the Probation Office's recommendation of 20 years imprisonment is necessary and appropriate.

## C.   Joann Crupi

Crupi, too, exhibits an unwillingness to admit to the reality of her involvement in the fraud at Madoff Securities.  In Crupi's sentencing submission, she leaves out any discussion of the core of her criminal conduct in this case.  As was made clear at trial, Crupi was a manager on the 17th floor of Madoff Securities and one of the most proactive participants in the fraud.  While her sentencing submission claims that her offense conduct has been just "lump[ed]" in with the other defendants, (JC Mem. at 26), the Government submits that that is simply not the case.  Her conduct in the fraud was distinct – and egregious.

The evidence showed that Crupi was on the rise in the management of the investment advisory business.  Bongiorno ran the day-to-day operations of the fraud alone from the 1970s until the mid-1990s.  At that point, DiPascali took on a larger role and helped her manage the business.  As Bongiorno spent more and more time in Florida in the 2000s, Crupi's responsibilities and importance on the 17th floor grew.  This is plain from the important part she played in the audits that took place in the 2000s. As Peter Madoff explained to the SEC shortly after Madoff was

arrested:  "[t]o find out more about the 17th floor, [one would] need to talk to Frank DiPascali and JoAnn Crupi."  (Tr. at 3430-31).

Crupi was privy to some of the most openly fraudulent conduct at Madoff Securities.   Again the Government will not go back over the evidence set forth in its Post-Trial Brief, but below are just some of the facts established at trial that show Crupi's important role in the fraud:

- In connection with the first SEC "Swanson" audit, she "googled" banks on the internet to fraudulently match them up with customer statements, and then directed O'Hara and Perez to insert the foreign banks into trading blotters.  The purpose of this was to make it appear that those banks had custody of the securities purportedly in the accounts of Madoff's clients, so the SEC would  not think that the Madoff firm had custody of those assets, (Tr. at 5015);

- Crupi, along with O'Hara and Perez, tossed around a SIAC report to make it appear "used" in connection with the first KPMG audit in order to deceive the auditors who were at Madoff Securities to inspect its books and records, (Tr. at 4612-18, 5181-83);

- Crupi and DiPascali practiced a fake trading scenario to be used in case an auditor or other outsider came to Madoff Securities.  To do that, "someone would play the role of the [trading] counterparty by literally going into [the] closet" and utilizing a computer linked to the 17th floor "trading" room.  Crupi and DiPascali discussed and practiced the fake trading ruse many times, (Tr. at 5223-25);

- As a key player on the 17th floor, DiPascali kept her apprised ("probably verbatim") of the meeting he had with Bonventre in which Bonventre told DiPascali what cover story he was going to use if the fraud was ever exposed, (Tr. at 5303);

- Crupi worked with DiPascali on the KPMG audit in 2008 to create an additional batch of fake documents, (Tr. at 5335-36);

- Crupi was in the loop as the firm collapsed – she knew Madoff was out of money and she knew that he was shredding documents, (Tr. at 5462-

63), and yet she continued to take in and send out customer money, (Tr. at 5452-55; GX 105-c103, at 2-6).[2]

In addition, Crupi was also responsible for overseeing the Chase '703 account, (Tr. at 903), which she did through a daily worksheet, (*see* GX 105-c6).  On a daily basis, she also worked closely with DiPascali to backdate fake trades and manage customer accounts in the investment advisory business.

Moreover, despite her claim that financial gain was not a motive for her participation in the fraud, (JC Mem. at 25), Crupi and her family members had investment advisory accounts that were stocked with bogus trades.  Importantly, Crupi's trading, which sometimes included intentionally incurring fake losses for tax purposes, (see GX 2000-93), by itself demonstrates a plain understanding that the firm's trading was fake and that she sought financial benefit through the firm's illegal activity.  In addition to the investment advisory accounts, Crupi charged tens of thousands of dollars in personal expenses on the corporate credit card and then did not pay any taxes on that money.  And Madoff bought her a lavish beach house in New Jersey, paid for with millions of dollars in stolen customer money taken directly from the Chase '703 account.

To say there was no financial motive is to ignore reality.  Crupi was well paid during her time at Madoff Securities and the promise of future earnings, on the order of what DiPascali and even Bongiorno received, surely was a not lost on her.

---

[2]   Crupi has argued that she did not literally take in or send out money because those functions were handled in the cage.  True enough.  But it was Crupi who directed the activity in the cage.

27

In short, Crupi's contentions that her role was limited to "handl[ing] a number of ministerial responsibilities" and that she "was a low level operative," (JC Mem. at 27), are not grounded in reality.  In light of her conduct in connection with the audits by the SEC and KPMG, Crupi's assertion that she "*may* have, in some of these tasks, enabled the fraud" is galling.  (*Id.* (emphasis supplied)).  She was an instrumental part of the fraud.  She constructed lies and deceptions to trick auditors.  She did not blink when she learned that the firm was collapsing and documents were being shredded.  Her role was essential to the fraud's success and her sentence should reflect it.  For those reasons, the Government submits that she should receive a sentence significantly harsher than the 14 years recommended by the Probation Office.

## D.   Jerome O'Hara and George Perez

Because the offense conduct for both Jerome O'Hara and George Perez is closely intertwined, the Government addresses their offense conduct together.  Both O'Hara and Perez, in essence, deny the jury's verdict.  Perez, in particular, is defiant of the jury's decision and his sentencing papers are filled with false statements and denials of facts plainly established at trial.  The Government submits that the Court should consider increasing Perez's Guidelines Sentencing range based on these assertions.

### 1.   O'Hara and Perez Were Knowingly Involved in the Fraud

The Government will not reiterate the proof it set forth its Post-Trial Briefing.  The Government does however want to point to some pieces of evidence

28

adduced at trial that shows the extent to which O'Hara and Perez were immersed in the fraud. Among other things, Perez and O'Hara did the following in connection with the fraud:

- Discussed the fact that Madoff had rifled through the bags of the SEC examiners who were at the firm while O'Hara and Perez were ginning up false documents, (Tr. at 5138);

- Discussed the idea of possibly bugging the room where those SEC investigators were situated, (Tr. at 5143);

- In connection with a KPMG audit that followed that SEC review, after generating numerous fake documents, attended a dinner DiPascali and Crupi where either O'Hara or Perez made a toast to "tricking the auditors," (Tr. at 5176-77);

- As discussed above, tossed around a SIAC report to make it look "used" in order to deceive those same auditors they set out to "trick," (Tr, at 4612-18, 5181-83)

- After telling Madoff he should shut down the entire investment advisory business, they told DiPascali "that they could pretty much ask for anything they want," but they did not want to be too greedy because their "salary and bonuses [might] jump off the page somewhere down the road and [they] [might] get in a lot of trouble." (Tr. at 5286). At this time, O'Hara proposed being paid with diamonds in order to receive more money without creating a paper trail. (Tr. at 5287);[3]

- After Madoff's arrest, O'Hara told Haresh Hemrajani to not give the trustee any documents he requested "right away," but to instead "stretch it out to a week" and "not give all the details," (Tr. at 8559; *see*

---

[3]     Prior to trial, the Government moved *in limine* to introduce evidence that O'Hara and Perez committed tax fraud by failing to report approximately $100,000 that they were each given as bonuses through "book entry" transfers to their investment advisory accounts after the 2004 audit. Although the Court excluded that evidence, there is no dispute that they received the money or that they failed to report it. The Government submits that this is relevant conduct that the Court should consider at sentencing.

> *also* Tr. at 8558 (Hemrajani testifying that Perez also told him not to provide information to the trustee, but to let Perez handle it instead)).[4]

This evidence plainly contradicts the numerous protestations of innocence made by O'Hara and Perez, and plainly shows their knowing participation in the fraud.

### 2.    O'Hara and Perez Continue to Refuse to Accept Responsibility

Both O'Hara and Perez submitted numerous objections to the PSR. The Court does not need to address all of these objections because the defendants' offense conduct is embodied in the verdict rendered by the jury. Nonetheless, there are numerous entirely baseless objections made by O'Hara and Perez that are not supported by the record. As with Bonventre, these objections are to core facts that were necessarily decided by the jury. Their continued denial shows a lack of remorse and disrespect for the seriousness of these proceedings – which should play a role in the sentence they are to receive.

For example, Perez claims that "the proof at trial failed to establish that George Perez had knowledge that alternative sets of books and records were being created 'specifically to deceive the SEC, the taxing authorities, or [KPMG]." (Perez Objections to PSR at 1-2). Instead, Perez dusts off his summation and claims that

---

[4]    Prior to trial, the Government moved *in limine* to introduce evidence that, after the firm's collapse, O'Hara and Perez accessed the Madoff Securities computer systems without authorization and printed out copies of various programs, such as CASH1750 – the "special advisory accounts" program discussed below. O'Hara and Perez claimed that they printed these programs, which were instruments of the fraud, to show potential employers. Although the Court excluded that evidence, there is no dispute that they in fact accessed and printed the files. The Government submits that this is relevant conduct – both the unauthorized access and the subsequent lies – that the Court should consider at sentencing, as well.

"Perez was lied to by Frank DiPascali, his boss, about the purpose of the documents being created for various audits." (*Id.* at 2). The jury, the fact finder in this case, roundly rejected that argument and convicted Perez of knowingly committing securities fraud with respect to KPMG (Count Seven) and knowingly falsifying books and records in connection with the SEC and KPMG audits (Counts Ten and Thirteen). The fact that Perez clings to this argument, despite its prior rejection and facial implausibility, signals a failure to accept responsibility.

To that point, during trial and throughout their sentencing submissions, both O'Hara and Perez repeatedly argue that they were lied to by DiPascali and others and that, as a result, they did not knowingly participate in the fraud.

That argument is specious and ignores what *actually happened.* DiPascali certainly did lie to both O'Hara and Perez. But the lie that he told, on its face, was still requesting O'Hara and Perez to create false documents to give to the SEC – to "fudge" them, as DiPascali put it. (Tr. at 5033). That is, the lie DiPascali told was one that asked O'Hara and Perez to commit an obvious crime – to generate false records instead of turning over what was actually asked for. Later, as the SEC and KPMG audits continued, O'Hara and Perez were asked to create different, contradictory fake records. During that process, DiPascali stopped lying to them for a simple reason: there were no plausible lies to justify this conduct. Or, as DiPascali explained, he stopped lying to them because there was no longer a "viable explanation" to justify the fraudulent activities they were engaging in. (Tr. at 5267).

31

And all of this presumes that O'Hara and Perez *ever* believed DiPascali's lies. The Government believes there is compelling evidence to the contrary, and that O'Hara and Perez knew far earlier that the entire investment advisory business was a fraud – which was perhaps why they expressed no shock or dismay when DiPascali asked them to "fudge" reports for the SEC. It is simply the case that DiPascali did not understand the inner workings of the computer programs that O'Hara and Perez created. But since at least 1994 – ten years before the first SEC audit – Perez had created the prototype for the "special" programs, complete with numerous pseudo-random number generators to create fake trading records. (*See* GX 5000-10 ("DiffPrgmGPLIB_GEN0001_TGIF0603_SPCL1K"); *see also* Tr. at 7904, 8068-8071 (Rich Diedrich, explaining that GEN001, created by Perez in 1994, among other things, created random trade times by "by taking share value, the number of shares, and pricing values, multiplying them together")). And O'Hara and Perez had both worked on STMTPro – the program that served no purpose other than the creation of false books and records that would not be retained – before that, in 1991 and 1992. (*See* GX 5000-10 ("SourceProcSTMTPro8")). Indeed, as early as 1993 – immediately after House 17 and House 05 were physically separated onto two different servers – only O'Hara and Perez were permitted to access the programs associated with the fraudulent investment advisory business. (Tr. at 8550; *see also* Tr. at 8672-74 (Haresh Hemrajani, testifying that "within ten minutes" of accessing House 17, O'Hara called to question why he had logged in).

32

That O'Hara and Perez clearly knew that they were engaged in fraud is bolstered not only by the powerfully incriminating nature of the programs that they wrote, but also by their actions, as described above, which included toasting the success of the deception of the auditors, tossing around recently minted fake documents, and leveraging their knowledge of the fraud to extract raises from Madoff. The fact that they still, at this late stage, cling to their claim that they were completely duped by Madoff and DiPascali is not supported by the record or the verdict rendered by the jury.

This failure to atone is clearly set out in Perez's overt refusal to accept responsibility for any of his own criminal conduct. In his sentencing letter, Perez writes to the Court and claims that "I have never lived my life in a way consistent with the conduct I have been found guilty of." (Letter of George Perez dated June 16, 2014, at 2). That is, of course, entirely inconsistent with the verdict and the proof in this case. Instead of accepting responsibility and showing remorse to the victims in this case, Perez claims that the jury "return[ed] an unconscionable number of indistinct verdicts," the prosecution "twist[ed] and exaggerate[d] the evidence against [him]," and DiPascali lied on the stand and "everyone [ate] it all up." (*Id.*) Strikingly, there is not a single word of apology, of any kind, to the victims of the Madoff fraud in Perez's letter.

Similarly, O'Hara asserts that "there was no evidence that [he] continued doing any more special work after 2006 apart from routine and innocuous global changes that affected many programs at once." (O'Hara Br. at 24). That is a

staggeringly false claim, on many levels.  After their meetings with Madoff and DiPascali in 2006, O'Hara and Perez proffered certain "ground rules," including that "[t]hey [would] not input data into the system and they [would] not change something that someone else put into the system."  (Tr. at 5288).  The reason for these "ground rules," as they described it, was that O'Hara and Perez "didn't want their fingerprints on this crap any longer."  (*Id.*)  So, throughout 2007 and 2008, O'Hara and Perez continued to write programs that furthered the massive fraud taking place in the investment advisory business at Madoff Securities.  Rich Diedrich prepared lists of hundreds of House 17 programs that O'Hara and Perez created or modified in the years 2007 and 2008 alone (*i.e.*, not including the stub portion of 2006).  (*See* GX 5000-10 ("Programs Changed After 2006" and "Procedures Changed After 2006"); Tr. at 8107-10).  None of these were "routine and innocuous global changes."  (*See* Tr. at 8145-46 (Diedrich explaining what a "global change" is)).

    Some of the most important programs that O'Hara and Perez developed during this time period were called CASH1750 and CASH1752.  Those programs, which were similar to one another, included "a procedure that filters out accounts that have a specific flag in the name file and then allows editing of the fields within files associated with those accounts, within a copy of the file associated with those accounts, and then printing reports, and then deleting the files that were edited."  (Tr. at 8076).  As DiPascali similarly testified, "a series of software programs that were remarkably similar to the ones that had been previously been used were

34

modified so as to allow the operator of the system, the keypunch girls . . . to physically make the changes." (Tr. at 5318). This program permitted the generation of "special advisory book and records" in furtherance of the fraud in the investment advisory business. (Tr. at 5305, 5318). To claim that there is was "no evidence" that O'Hara continued doing any more fraud-related programs after 2006 is to ignore objective, forensic evidence that was actually adduced at trial.

In many ways, the sentencing submissions by O'Hara and Perez are symptomatic of all the defendants. Despite being convicted on all charges submitted to the jury, the defendants pretend as though the six month trial never took place and they all essentially deny their involvement in this epic fraud, casting themselves instead as innocent victims whose lives were devastated by Madoff's betrayal, and who now have been further victimized by the injustice of the prosecution and the irrationality of the jury's verdict.

*    *    *

As with the other defendants, O'Hara and Perez's refusal to acknowledge their own criminal conduct speaks to their character and refusal to accept responsibility for a crime that hurt thousands of people. The Probation Office recommends that they each be sentenced to eight years' imprisonment. This is not nearly enough. Even Perez admits that a defendant who wilfully participated in the fraud for years deserves a "harsh sentence given the seriousness of the crime," even as he denies that he has any responsibility. (GP Mem. at 36).

35

As we discuss below, although their conduct was arguably the least severe of the five defendants who were convicted after trial, O'Hara and Perez's conduct was significantly more serious than the very serious conduct for which Peter Madoff – who pleaded guilty and accepted some responsibility for his crimes – was sentenced to ten years' imprisonment.  In the Government's view, O'Hara and Perez are deserving of sentences substantially more severe than that.

## DISCUSSION

### A.    Application of the Sentencing Guidelines

A criminal sentence must be crafted to adequately reflect, among other things, the seriousness of the offense, the need for respect for the law, and the need to punish the offense and deter future criminal conduct.  *See* 18 U.S.C. § 3553(a)(2). The "starting point" in making any sentencing determination, however, remains the United States Sentencing Guidelines.  *Gall v. United States*, 552 U.S. 38, 49 (2007). In this case, as discussed below, the Probation Office correctly determined that the Guidelines offense conduct for each of the five defendants is literally off the charts, resulting in Guidelines ranges equal to the combined statutory maximum sentences for each defendant's crimes of conviction.  *See* U.S.S.G. § 5G1.2(d).

That is, the applicable Guidelines sentence for the defendants is as follows:

Daniel Bonventre      220 years[5]

Annette Bongiorno      78 years[6]

Joann Crupi      175 years[7]

---

[5]      Bonventre's PSR erroneously lists his statutory maximum punishment, and therefore his Guidelines range, as 160 years' imprisonment.  *See* DB PSR at 43. The PSR mistakenly lists the statutory maximum for Counts Nine (falsifying the books and records of a broker-dealer) and Fifteen (false filings with the SEC) as five years' imprisonment, when they should be 20, and it appears to have otherwise incorrectly added the sentences on Bonventre's various counts of conviction.  He was convicted of Counts One through Four (five years each), Counts Six through Eleven (20 years each), Counts Twelve through Fourteen (five years each), Count Fifteen (20 years), Count Eighteen (30 years), Counts Twenty through Twenty-Four (three years each).  The sum of those statutory maximum sentences is 220 years, not 160, as calculated in the PSR.  We apologize for not bringing this error, and the similar errors with respect to the other defendants, to the attention of the Probation Office sooner.

[6]      Bongiorno's PSR erroneously lists her statutory maximum punishment, and therefore her Guidelines sentence, as 63 years' imprisonment.  *See* AB PSR at 47. The PSR mistakenly lists the statutory maximum for Count Nine (falsifying the books and records of a broker-dealer) as five years' imprisonment, when it should be 20, and it appears to have otherwise incorrectly added the sentences on Bongiorno's various counts of conviction.  She was convicted of Count One (five years), Count Six (20 years), Count Nine (20 years), Count Twelve (five years), Counts Twenty-Five through Twenty-Nine (five years each), and Count Thirty (three years).  The sum of those statutory maximum sentences is 78 years, not 63, as calculated in the PSR.

[7]      Crupi's PSR erroneously lists her statutory maximum punishment, and therefore her Guidelines sentence, as 145 years' imprisonment.  *See* JC PSR at 44. The PSR mistakenly lists the statutory maximum for Counts Nine and Ten (falsifying the books and records of a broker-dealer) as five years' imprisonment, when it should be 20.  She was convicted of Counts One and Two (five years each), Counts Six and Seven (20 years each), Counts Nine and Ten (20 years each), Counts Twelve and Thirteen (five years each), Counts Sixteen and Seventeen (30 years each), and Counts Thirty-One through Thirty-Three (five years each).  The sum of those statutory maximum sentences is 175 years, not 145, as calculated in the PSR.

Jerome O'Hara                    100 years[8]

George Perez                    100 years[9]

Although the Guidelines are of course no longer mandatory, the Supreme

Court has made clear that a sentencing court should "consult" the Guidelines and

"take them into account" when sentencing. *United States v. Booker*, 543 U.S. 220,

264 (2005). The Court has reaffirmed that the Sentencing Commission "continues

to fill an important institutional role because it has the capacity courts lack to base

its determinations on empirical data and national experience, guided by a

professional staff with appropriate expertise. Accordingly, we have instructed that

district courts must still give respectful consideration to the now-advisory

Guidelines (and their accompanying policy statements)." *Pepper v. United States*,

__ U.S. __, 131 S. Ct. 1229, 1247 (2011) (internal quotation marks, citations, and

alterations omitted). Indeed, "a district court should begin all sentencing

---

[8]     O'Hara's PSR erroneously lists his statutory maximum punishment, and
therefore his Guidelines sentence, as life imprisonment. *See* JOH PSR at 43.
O'Hara was convicted of Counts One and Two (five years each), Counts Six and
Seven (20 years each), Counts Nine and Ten (20 years each), and Counts Twelve
and Thirteen (five years each). The sum of those statutory maximum sentences is
100 years, which is therefore the appropriate Guidelines sentence pursuant to
U.S.S.G. § 5G1.2(d).

[9]     Perez's PSR erroneously lists his statutory maximum punishment, and
therefore his Guidelines sentence, as 70 years' imprisonment. *See* GP PSR at 41.
The PSR mistakenly lists the statutory maximum for Counts Nine and Ten
(falsifying the books and records of a broker-dealer) as five years' imprisonment,
when they should be 20. Perez was convicted of Counts One and Two (five years
each), Counts Six and Seven (20 years each), Counts Nine and Ten (20 years each),
and Counts Twelve and Thirteen (five years each). The sum of those statutory
maximum sentences is 100 years, not 70, as calculated in the PSR.

proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49; *see also United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) ("Even after *Gall* and *Kimbrough*, sentencing judges, certainly, are not free to ignore the Guidelines, or to treat them merely as a 'body of casual advice.'" (quoting *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005))).

There is no dispute that the November 1, 2013 United States Sentencing Commission Guidelines Manual should control the defendants' sentencing, nor that the appropriate Guideline is section 2B1.1, which applies to "Fraud and Deceit," among other crimes.[10]  Under section 2B1.1(a)(1), the base offense level for the defendants' crimes is 7, because they were each convicted of an offense (*e.g.*, Counts Six and Nine) with a statutory maximum term of imprisonment of 20 years or more.

### 1.    Loss Amount

The defendants' offense level should then be increased by 30 levels because the loss involved in their offense exceeded $400 million.  *See* U.S.S.G. § 2B1.1(b)(1)(P).  Loss in this case is measured by "actual loss," meaning "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. §2B1.1 comment. (n. 3(A)(i)).  "Reasonably foreseeable pecuniary harm," in turn,

---

[10]     It is arguable whether all of the counts of conviction are properly grouped for all of the defendants, particularly whether the tax counts should be grouped with the non-tax counts.  However, because the offense level on the fraud counts alone exceeds the top of the Guidelines chart, there is no need for the Court to resolve this issue.

"means pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* comment. (n. 3(A)(iv)). *See also id.* comment. (n. 3(F)(iv)) (special rule of construction for Ponzi scheme cases). Applying these definitions, the PSRs conclude that each defendant is responsible for $17.5 billion in losses.

Various defendants attack this conclusion, making two basic points. *First*, Joann Crupi questions the factual basis for the PSR's calculation of $17.5 billion in losses. *Second*, various of the defendants challenge the Probation Office's conclusion that the losses were "reasonably foreseeable" to the individual defendant. As a variation on this argument, certain defendants argue that even if some of the loss was foreseeable to them, not all of it was.[11]

> ### a.   The Actual Losses Were At Least Approximately $20 Billion

As a threshold matter, Crupi's sentencing submission goes on at length about the perceived absence of an evidentiary basis for the multi-billion dollar loss, attributing the figure to the SIPA trustee and noting that it has "[n]ever really been tested in a court of law." (JC Mem. at 13). Bizarrely, Crupi even goes so far as to accuse the Probation Office of gamesmanship and bad faith, declaring that "[t]he failure to so much as set even a rudimentary factual predicate is designed to attempt to prevent Ms. Crupi from mounting any defense to the loss amount." (*Id.*).

---

[11]   Several defendants also challenge the fraud Guideline itself, with particular emphasis on the role of loss amount. Because that argument does not go to the calculation of the Guidelines range, which all parties agree the Court must do, we address it below.

40

These accusations are all the more strange because the Government proved the loss amount at trial, and that figure was even higher than the one contained in the PSRs.  Bruce Dubinsky testified clearly that the actual loss suffered by direct investors in Madoff Securities was approximately $20 billion, with "paper losses" of approximately $66 billion.  The final slide of Mr. Dubinsky's presentation could not have been clearer on this point:

Ponzi statistics- IA Business

| As of December 2008 | |
|---|---|
| Purported Value of IA Business Securities | $66 billion |
| Actual IA Business Customer Liabilities | $20 billion |
| Cash Balance of IA Business-Related Accounts | $0.2 billion |

149

(GX 5000-1, at p. 149).  "The actual customer liabilities, meaning on a cash in-cash out basis of what the business owed back in cash – remember, there was no trading that went on, so the 66 billion is just a fiction.  But the amount of cash that was owed back was roughly $20 billion."  (Tr. at 1459).  Under controlling Second Circuit

41

case law, this is plainly the appropriate loss amount.  *See, e.g., United States v. Hsu*, 669 F.3d 112, 122 (2d Cir. 2012) (in Ponzi case, "[t]he guidelines provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested").  Thus, the notion that the Government has failed to prove the aggregate loss amount is simply false.[12]

**b.    The Losses From the Ponzi Scheme Were Reasonably Foreseeable to Each of the Five Defendants**

Equally misguided is the suggestion that the defendants are not responsible for that loss.  The Government certainly agrees with the statement that each of the five defendants "have different levels of culpability," (JC Mem. at 11) – the Government's view of which is set forth below.  But each of the defendants is not responsible for a different loss amount.  The losses as of December 2008 – when all five defendants were long-standing participants in the fraud – was approximately $20 billion.  Those were losses that each defendant "knew, or under the circumstances, reasonably should have known, was a potential result of the offense."  U.S.S.G. § 2B1.1 comment. (n.3(A)(iv)).

---

[12]    As discussed in the section regarding number of victims, this is actually a dramatically conservative figure, based on Mr. Dubinsky's methodology.  The actual losses may well be several multiples of the $20 billion calculated by Mr. Dubinsky. That point is academic for Guidelines purposes, however, and there is no need for the Court to calculate the loss amount with total precision.  *See generally United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007) (requiring only a "reasonable estimate" of the loss); *see also* U.S.S.G. § 2B1.1 comment. (n. 3(C)) (same).

We start from the proposition that all five defendants were convicted on Count Six, which charged substantive securities fraud in connection with defrauding the investment advisory clients of Madoff Securities by their "participat[ion] in the creation and dissemination of records and documents that misrepresented to investment advisory clients of Madoff Securities that various trading activity had occurred in their accounts."[13]  Although certain defendants maintain that they did not interact directly with Madoff Securities investors, it is undisputable that each and every one of the defendants created false documents – account statements, trade confirmations, FOCUS reports, DTC reports, etc. – the

---

[13]     Because the defendants were convicted of substantive securities fraud involving defrauding the Madoff Securities investment advisory clients, their repeated citations to *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995), or to the Guidelines provisions relating to "relevant conduct" are somewhat beside the point. This is not a case where the defendants are being held responsible for their co-conspirators' conduct.  Rather, as explained above, this is a case where the defendants acted in concert so that they themselves – each and every one of them – could defraud *all* of the customers of Madoff Securities.  They are therefore liable for the full loss amount.

In any case, even applying *Studley*, the defendants would be responsible for the full loss amount.  *See, e.g., United States v. Martin*, No. S2 03 Cr. 1115 (RWS), 2006 WL 1675935, at *3 n.3 (S.D.N.Y. June 16, 2006) ("While the scope of criminal activity a defendant decided to undertake may not necessarily be the scope of the entire conspiracy, where, as here, a defendant embraces the conspiracy as a whole and does not merely act as an independent sales person, he is responsible for the losses of the entire conspiracy." (citation to *Studley* omitted)).  Notably, it is the defendants who bear the burden of proof on this issue to affirmatively prove their "lack of knowledge and lack of foreseeability."  *United States v. Negron*, 967 F.2d 68, 72 (2d Cir. 1992) ("when a defendant asserts that he is not responsible for the entire range of misconduct attributable to the conspiracy of which he was a member, the Guidelines place on him the burden of establishing the lack of knowledge and lack of foreseeability."); *accord United States v. Hendrickson*, 26 F.3d 321 (2d Cir. 1994); *United States v. Martinez-Rios*, 143 F.3d 662, 677 (2d Cir. 1998), *abrogated on other grounds by United States v. Vonn*, 535 U.S. 55 (2002).

43

purpose of which was to fool investors.  It is also undisputable, as set forth above, that each and every one of the defendants knew that these documents were not only false, but that the trades and securities positions reflected on the documents simply did not exist.  Bongiorno and Crupi literally made up the transactions.  Bongiorno, Crupi, and Bonventre tracked and/or reconciled the activity in the '703 account, fully aware that it was funded with investor money, paid out investor redemptions, but that *none* of that money was ever used to pay for, or resulted from the sale of, securities.  O'Hara and Perez created computer programs that made up transactions (the "special" programs), as well as a program (STMTPro) the purpose of which was to be able to insert non-existent trades and positions into historical books and records.

Finally, it is undisputable that each and every one of the defendants was aware of the approximate size of the investment advisory business.  Again, Bonventre, Bongiorno, and Crupi maintained the bank account, and Bongiorno, Crupi, O'Hara, and Perez were involved in the month-end process of mailing out account statements to all of the investors.  The computer programs created by O'Hara and Perez also used the customer account data as an input.  Indeed, as Perez himself points out in his sentencing submission, he brought the A.NAME file – which contained a list of all of the thousands of investment advisory clients – to Matthew Cohen.

Taken together, these undisputable facts demonstrate that each of the five defendants "knew, or under the circumstances, reasonably should have known," the

size of the fraud and therefore the potential losses.  U.S.S.G. § 2B1.1 comment. (n.3(A)(iv)).  Indeed, in approximately 2006, O'Hara and Perez warned Kevin Fong that he should close his account, and at about the same time, Bongiorno warned Cotellessa-Pitz that she should withdraw enough money to pay for her children's college education.  Thus, the defendants plainly knew that investment advisory clients were exposed to loss.

Nonetheless, certain of the defendants contend that no losses were reasonably foreseeable to them because they might have believed that, even if the funds were not being invested as promised, Madoff Securities actually had assets to pay back the firm's investors.  (This is precisely what cooperating witness David Kugel testified he believed to be the case, though, unlike these five defendants, he never had access to any of the investment advisory business's records.)  Even if that were so – although the Government believes, as set forth above, that it proved beyond a reasonable doubt that the five defendants were aware that the investment advisory trading was non-existent, and that investors were instead being paid out of other investors' money in the '703 account – the full losses of the fraud were still reasonably foreseeable.  It is a common feature of investment frauds, especially Ponzi schemes, that the perpetrators fully intend to pay their victims back.  But that is ultimately irrelevant.

*United States v. Turk*, 626 F.3d 743 (2d Cir. 2010), cited by several of the defendants, is instructive.  In *Turk*, the defendant perpetrated a real estate fraud scheme in which she solicited investors, promising that they would have a first

mortgage on the subject properties.  In fact, Turk failed to record the mortgages, but created fraudulent documentation to demonstrate that she had.  She did, however, obtain loans from banks, which did obtain validly recorded mortgages.  Turk argued that she believed the real estate was actually a good investment, and that both the investors and the banks would be paid back in full, and that she would profit as well.  When the properties instead declined in value, the fraud unraveled, and the investors discovered that they had only unsecured claims to assets that were fully secured by the bank loans; as a result, they lost approximately $27 million.

Turk argued that she was not responsible for the investors' actual and undisputed losses for Guidelines purposes.  She contended that the loss was the result of unforeseeable market conditions, rather than her conduct.  But the Second Circuit strongly disagreed:

> While purporting to lament that she did commit fraud in failing to record the individual investors' mortgages (despite falsely telling them she had done so and creating fraudulent documents to show that she had), Woolf Turk implicitly asks this Court to hold that she is to be punished only for the abstract moral wrong of saying one thing and doing another, and not for ruining lives as a potential, if admittedly not certain, result of that dishonesty. We reject that invitation.

*Id.* at 748.  Instead, the Court held that Turk was responsible for the full amount of the losses:

> By definition, a potential result of being an unsecured creditor is the loss of one's interest to the higher-priority interests of secured creditors. That potential result is unremarkable if the unsecured creditors extend credit with full knowledge that they bear the risk of total loss,

> but the crux of Woolf Turk's offense is that she obtained
> loans by fraudulently leading unsecured creditors to
> believe that they were secured creditors. Without this
> deceit, she could not have obtained her victims' money. It
> follows that a potential direct result of Woolf Turk's
> specific fraudulent act was the total loss of the moneys
> the individual investors had given her. That is enough to
> constitute "reasonably foreseeable pecuniary harm."

*Id.* at 750. Any other conclusion, the Court held, "would be to encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk." *Id.*

The same reasoning applies here. The defendants told investors, through elaborate forgeries and fake documents, that their money was being invested safely in readily marketable and stable securities. In fact, it was not – the investors owned no such securities. At a minimum, the defendants here lied to investors about where their money was invested, without knowing where it was invested. That money could have been invested in real estate and foreign banks, as David Kugel believed; it also could have been invested in high-stakes poker games, or bitcoins, or another Ponzi scheme.

The defendants' elaborate lies took those investing decisions away from the customers of Madoff Securities, and lulled them into believing that their money was invested in extremely safe, stable, highly liquid securities when it plainly was not. At best, the victims had an unsecured interest in some phantom investment about which neither the defendants nor the investors knew anything. "By definition," the investors bore the risk of that mystery investment becoming worthless. Had the

47

investors understood where the money was going – again, assuming it was going someplace other than the defendants' pockets – they would have proceeded "with full knowledge that they bear the risk of total loss." But, as in *Turk*, the victims in this case were kept in the dark. "Without [the defendants'] deceit," they "could not have obtained [their] victims' money." Thus, as in *Turk*, the victims' full, actual losses were reasonably foreseeable to the defendants.[14]

### c. The Defendants Are All Responsible for At Least $20 Billion in Losses

Finally, Crupi contends that she "should not be held responsible for conduct occurring prior to her entry into the conspiracy." (JC Mem. at 18). But as Crupi herself obliquely acknowledges, (*see id.* at 19), this argument proceeds from a false premise. As the chart above illustrates, the losses from the scheme were approximately $20 billion *as of December 2008*. Prior to the firm's collapse, there were no losses. Thus, the actual losses resulting from the direct conduct of the five defendants was approximately $20 billion.

---

[14]  Perversely, if the defendants actually believed that there were assets available to back up the figures being reported to investors, then the defendants are probably responsible for a significantly *higher* loss figure. A defendant who knowingly participates in a Ponzi scheme can reasonably foresee that investors will lose all of the money they put in. But if the defendants believed that the Madoff Securities account statements reflected actual value that investors had at the firm – though not invested as promised – then their *intended* losses would seem to be the dollar figures reflected on the account statements. There is no reason for the Court to reach this issue, however, because (a) the five defendants all understood they were helping to perpetrate a Ponzi scheme; and (b) either way, the appropriate loss amount is more than $400 million, which results in the maximum offense level enhancement under the Guidelines.

48

It is certainly true, however, that at least three of the defendants (Crupi, O'Hara, and Perez) were not part of the fraud from its inception. While this is not relevant for purposes of calculating their Guidelines loss amount for the reasons just given, it is certainly a relevant sentencing fact. In that connection, however, the Government notes that prior to the defendants' involvement in the fraud (which dates back to at least the early 1990s for all five defendants), the Madoff Securities fraud operated on a far, far smaller scale. It was not until the collapse of Avellino & Bienes in 1992 that the Ponzi scheme exploded.

Again, this point was graphically illustrated during Mr. Dubinsky's testimony:



(GX 5000-1, at p. 148; *see also* Tr. at 1457 (Dubinsky, discussing the "rampant growth" of the investment advisory business after 1992)).  By that time, each of the five defendants was well-established as a conspirator.  Indeed, Bonventre, Bongiorno, and Crupi were active participants in covering up the firm's role in Avellino & Bienes, and O'Hara and Perez were hired specifically for their technological expertise in assisting Frank DiPascali to massively scale the fraudulent investment advisory business.  Simply put, while the fraud pre-existed certain of them, the five defendants were integral in turning what was a large, but by no means unprecedented, Ponzi scheme into the biggest Ponzi scheme of all time, by a long shot.

> ### d.   Even if the Defendants Are Responsible for Something Less than the Full Loss Amount, They Are All Plainly Responsible for More than $400 Million for Guidelines Purposes

Although the Government strongly believes, for the reasons set out above, that each of the five defendants is fully responsible for the full losses of the fraud, or at least approximately $20 billion, there is no colorable dispute that each of the defendants is at least responsible for $400 million or more in losses.  Because that is the cut-off for the maximum offense level enhancement under the Guidelines, the Government also points to the following evidence that the Court may wish to rely upon in making specific findings, for Guidelines purposes, that each defendant reasonably foresaw $400 million or more in actual or intended losses:

- Bonventre:  The value of the bank loans that Bonventre fraudulently procured for Madoff Securities was approximately $487 million, not

50

including the attempted loan (and therefore intended loss) of $200 million in November 2008.  (*See* GX 104-21 and 104-a242 (Bank of America lines of credit); GX 105-a46 through 105-a63, 105-a428, and 206-1 through 206-4 (JPMorgan loans); GX 206-19 (attempted loan)).

- Bongiorno:  The value of the ACF Money Services Pension Plan, which Bongiorno retrospectively changed from consisting principally of equities to entirely of bonds, exceeded $1 billion.  (*See* GX 5000-1, at p. 105 (showing reallocation of assets); GX 105b-17 (ACF account statement purporting to hold approximately $700 million in assets). Similarly, the amount that Madoff Securities had to raise and pay out after the collapse of Avellino & Bienes – based on account statements falsified by Bongiorno – was approximately $440 million.  (Tr. at 9604-06 (Bonventre, reading from the *Wall Street Journal* article introduced as DB-71)).

- Crupi:  On the day in December 2008 after Frank DiPascali explicitly told her that Madoff Securities was a Ponzi scheme that was on the verge of collapse, Crupi noted that the '703 account contained approximately $300 million in cash, but that the firm owed investment advisory clients more than $1.4 billion in pending redemption requests. (*See* Tr. at 5452 (DiPascali recounting that he told Crupi on December 4, 2008, that "Mr. Madoff had told [him] that the fraud was no longer able to go on"); GX 105-c103, at p.6 ("daily pad" maintained by Crupi for December 5, 2008)).

- O'Hara & Perez:  HSBC, which sent KPMG to Madoff Securities in order to ensure the safety of the assets it administered, and which O'Hara and Perez (and Crupi) toasted to "tricking" or "fooling," was responsible for at least $3 billion invested at Madoff Securities.  (Tr. at 5175-77 (DiPascali recounting toast); Tr. at 6859 (Christine Coe, from HSBC, testifying that, in 2005, the HSBC funds had approximately $3 billion invested in Madoff Securities; by 2008, that figure had "gone up significantly.")).

51

Indeed, as was pointed out repeatedly throughout the trial, at several points major

publications, including *The Wall Street Journal* (in 1992) and *Barron's* (in 2001)

published articles discussed the size of Madoff Securities's investment advisory

business.  (*See, e.g.,* Tr. at 9601 (Daniel Bonventre reading from the *Barron's*

article, admitted as DB-10, which reported in 2001 that "Bernie Madoff [] manages

6 billion to 7 billion for wealthy individuals, that's enough to rank Madoff's

operation among the world's three largest hedge funds)).

### 2.    Number of Victims

The defendants' offense level should be further increased by 6 levels because

the offense involved 250 or more victims.  *See* U.S.S.G. § 2B1.1(b)(2)(C).  Apart from

the just-refuted argument that certain defendants foresaw no losses (and therefore

no victims), no defendant objects to the application of this enhancement.  Indeed, by

any measure, the fraud at Madoff Securities had thousands – if not tens or

hundreds of thousands – of victims.

For example, the PSRs note that, according to the SIPA trustee appointed to

liquidate the business of Madoff Securities, there were 2,518 investors who suffered

a loss.  But even this figure massively understates the true number of victims of the

fraud.  2,518 is the number of individuals or entities that held an account directly

with Madoff Securities, and who suffered a loss on a cash-in versus cash-out basis.

*See generally* The Madoff Recovery Initiative, http://www.madofftrustee.com/claims-

03.html (last visited July 15, 2015 at 12:01 PM).  This is the accurate number of

"customers" holding valid claims within the meaning of SIPA.  *See generally In re*

*Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229 (2d Cir. 2011) (affirming trustee's determination of "net equity" on a cash-in versus cash-out basis); *In re Bernard L. Madoff Inv. Secs. LLC*, 708 F.3d 422 (2d Cir. 2013) (affirming trustee's definition of "customer" to include only "direct" customers).

The trustee's figures do not include, however, the tens of thousands of victims of the fraud at Madoff Securities who invested indirectly, through feeder funds, investment clubs, family accounts, retirement plans, and other pooled investment vehicles. For example, the Court heard from Christine Coe at HSBC, which had certain responsibilities as custodian or administrator in connection with several Madoff Securities feeder funds, such as Thema, Kingate, and Optimal. (Tr. at 6563). In 2005, the HSBC funds had approximately $3 billion invested in Madoff Securities; by 2008, that figure had "gone up significantly." (Tr. at 6589). For purposes of the trustee's analysts, under SIPA, each feeder fund was counted as a single customer, some with multi-billion dollar allowed claims.

But as Ms. Coe acknowledged, the ultimate investors in these vehicles were "a range of investors," "generally . . . individuals." For example, Thema was "very similar to a mutual fund," where "some people [] would put small amounts of money" and "the more wealthy [] could put up larger amounts of money." (Tr. at 6564). Indeed, the trustee rejected thousands of customer claims precisely because they were indirect investors in Madoff Securities. *See In re Madoff Securities*, 708 F.3d 422. While these individual investors are not "customers" within the meaning of SIPA, they are surely victims under the Guidelines, because they "sustained any

part of the actual loss." U.S.S.G. § 2B1.1, comment. (n. 1) (also clarifying that victims including "corporations, companies, associations, firms, partnerships, societies, and joint stock companies"); *see also United States v. Lacey*, 699 F.3d 710, 715 (2d Cir. 2012).

The Department of Justice, meanwhile, recently completed the process of soliciting claims to the Madoff Victim Fund, which will distribute the more than $4 billion collected in civil and criminal forfeitures in this case to date. Unlike the SIPA proceedings, the Madoff Victim Fund *will* distribute funds to indirect investors who suffered an actual pecuniary loss as a result of the fraud at Madoff Securities. *See generally* Frequently Asked Questions, Madoff Victim Fund, http://madoffvictimfund.com/FAQ.shtml (last visited July 15, 2014 at 12:22 PM) (describing eligibility criteria).

The results of the Madoff Victim Fund claims process describe with greater accuracy the true extent of the fraud at Madoff Securities:

- More than 60,000 individuals and entities reported net losses in the Madoff Securities fraud.

- The total net investment loss is presently $74.3 billion; when the Madoff Victim Fund finishes tallying the claims, the Government expects that figure to increase to the $75-80 billion range. To be clear, these are *actual* losses, not paper losses.

- Claims were received from victims in 141 countries across six continents, and include not only individuals but hospitals, universities, pension plans, trust funds, foundations, and other charities throughout the world.

54

While these figures remain subject to change as the Government reviews the claims submitted to the Madoff Victim Fund, the point is a simple one that we have made repeatedly:  the fraud at Madoff Securities was unprecedented in its size and scope, and even the numbers employed in the PSR – which still comfortably make Madoff Securities the largest Ponzi scheme of all time – fail to remotely accurately capture its true breadth.

And even the Madoff Victim Fund's figures understate the true human toll of the fraud at Madoff Securities, because – like the trustee – the Madoff Victim Fund evaluates loss on a cash-in/cash-out basis.  Thus, investors who withdrew more from their Madoff Securities accounts than they paid in are not "victims" because they did not suffer any part of the "actual loss."  Although this is the correct analysis for Guidelines purposes, investors who withdrew more than they paid in were surely victimized in the ordinary sense of the word.  For example, the one individual investor that testified at trial, William Wallman, lost what he believed to be approximately forty percent of his life savings when Madoff Securities collapsed. (Tr. at 3318).  But because he had been an investor for so long, and had made modest withdrawals over time, the trustee properly denied Mr. Wallman's claim because he withdrew more than he put in.  (See GX 3556-3).  The disappearance of almost half of Mr. Wallman's wealth may not make him a "victim" within the meaning of the Guidelines, but he is a victim in every other sense of the defendants' crimes.

The contention that these defendants should not receive an enhancement for 250 victims – in view of the fact that the fraud involved at least more than 200 times as many – is meritless.[15]

### 3.   Sophisticated Means

The defendants' offense level should be further increased by 2 levels because the offense involved "sophisticated means."  *See* U.S.S.G. § 2B1.1(b)(10)(C).  As the Probation Office correctly determined, the defendants employed a host of "especially complex or especially intricate offense conduct pertaining to the execution or concealment of [the] offense."  *Id.* comment. (n. 9(B)).  The defendants, for example, created multiple sets of books and records; reconstructed years' worth of trading activity; conducted extensive research on market events; employed extraordinarily sophisticated information technology systems; perpetrated a complicated accounting fraud involving routing transactions through other institutions and/or countries; and took pains to ensure that their fabricated transactions conformed to the

---

[15]     For many of the same reasons – because the trustee's methodology counts "customers," rather than "victims," and because the defendants victimized numerous investors that may not qualify as "victims" for Guidelines purposes – Bongiorno's citation to articles estimating that approved SIPA claims may be paid out at 75 cents on the dollars is largely irrelevant.  (AB Mem. at 20-21). Indeed, even the trustee has acknowledged that the measure of victims' losses is greater than their "net equity"; he has simply explained that, under SIPA, the net equity claims will be paid first, and that the remaining fraud losses will be treated as ordinary unsecured claims.  *See, e.g.,* The Madoff Recovery Initiative, http://www.madofftrustee.com/facts-08.html (last visited July 18, 2014, at 1:49 PM) ("Those who withdrew more than they put into BLMIS in good faith do not have an allowed claim or priority for distributions at this time, but they do have a general creditor claim for fraud. All good faith customers of BLMIS, and other creditors in the liquidation such as service providers and vendors, have general claims against the BLMIS General Estate.").

complicated web of securities regulations.  *See generally United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003) (where a scheme involves various steps, the enhancement may apply "even if each step in the scheme was not elaborate"), *vacated on other grounds sub nom. Lauersen v. United States*, 543 U.S. 1097 (2005).

Amazingly, the only defendants to object to the application of this subsection are George Perez and Jerome O'Hara, the defendants who employed the most sophisticated means of all.  Neither O'Hara nor Perez even make this argument in their main sentencing submissions; in both cases, the objection is contained in their separate objections to the PSRs, and in both cases, the objections are perfunctory. (*See* Perez Objections to PSR at 8 ("We object to paragraph 114 because Perez's involvement in the fraud did not involve sophisticated means."); O'Hara Objections to PSR at 5 ("We object to the other enhancements . . . (2) because, as a computer programmer, Mr. O'Hara's involvement does not constitute sophisticated means relating to financial misdeeds.")).

These objections are wholly without merit.  As Richard Diedrich testified without contradiction, the computer programs created by O'Hara and Perez were the infrastructure of the fraud.  They contained a variety of sophisticated pseudo-random-number generators, including so-called "linear congruential generators" and other randomizing algorithms based on the day of the week or the third digit of a transaction number.  This conduct is precisely the sort of "sophisticated means" contemplated by the Guidelines.  *See, e.g., United States v. Hatala*, 552 Fed. Appx. 28, 30 (2d Cir. 2014) ("the sophisticated means enhancement was justified by

Hatala's intricate and complex computer programming"); *see also United States v. Calderon*, 209 Fed. Appx. 418 (5th Cir. 2006) (per curiam) (affirming sophisticated-means enhancement where defendant used off-the-shelf software to perpetrate fraud); *United States v. Lascola*, 45 Fed. Appx. 5 (1st Cir. 2002) (per curiam) (affirming sophisticated-means enhancement where defendant used computer program involving "little skill or training" to perpetrate scheme that was, as a whole, complex).[16]

### 4.   Endangering Solvency or Financial Security of Victims

The defendants' offense level should be increased by 2 additional levels because the offense (i) substantially jeopardized the safety and soundness of a financial institution; (ii) substantially endangered the solvency or financial security of an organization that, at any time during the offense, had 1,000 or more employees; and (iii) substantially endangered the solvency or financial security of 100 or more victims.  *See* U.S.S.G. § 2B1.1(b)(16)(B); *see also id.* § 2B1.1(b)(16)(C) (specifying that the adjustment under this prong combined with the number-of-victims enhancement shall not exceed eight; since the defendants receive a six-level enhancement for number of victims, they can receive only a two-level boost here).

---

[16]     Even if O'Hara and Perez did not qualify for a "sophisticated means" enhancement, they would certainly qualify for a "special skill" enhancement pursuant to Section 3B1.3.  *See* U.S.S.G. § 3B1.1 comment. (n. 4) (explaining that "special skill" is "a skill not possessed by members of the general public"); *see also* U.S.S.G. § 2B1.1 comment. (n. 9(C)) (where "sophisticated means" applies, do not also count "special skill").

The PSRs note that, according to the trustee, more than 800 customers suffered losses greater than $1 million.  Once again, the data from the Madoff Victim Fund is far more dramatic, with approximately 10,000 victims reporting losses greater than $1 million, including more than 100 claims reporting losses of more than $50 million.  In addition, as has been widely reported, the collapse of Madoff Securities took with it numerous other investment funds, charities, and other entities, and caused massive losses for numerous financial institutions.  *See generally* Madoff's Victims, *The Wall Street Journal*, available at http://s.wsj.net/public/resources/documents/st_madoff_victims_20081215.html (last visited July 17, 2014, at 1:10 PM).  The numerous letters submitted to the Court by victims of the Madoff Securities fraud further evidence the damage caused by the defendants' conduct.

There is simply no dispute that this enhancement applies, and no defendant has objected to it other than to repeat the same arguments about the scope of their conduct made in connection with the loss amount.  *See, e.g.,* Perez Objections to PSR at 8 (asserting, without explanation, that "[w]e object to paragraph 115 because it was not reasonably foreseeable to Perez that the fraud would endanger the financial security of 100 or more victims.").

### 5.    Registered Broker-Dealer/Investment Advisor

Finally, the defendants' offense level should be increased by four more levels because they committed violations of securities law and were people "associated with a broker dealer" and "associated with an investment advisor."  *See* U.S.S.G.

59

§ 2B1.1(b)(19)(A).  There is no dispute that Madoff Securities was a registered broker-dealer and acted as an investment advisor at all relevant times to the defendants' crimes.[17]  And of course there is no dispute that the defendants were employed by Madoff Securities, and thus "associated" with it.  *See* 15 U.S.C. § 78c(a)(18) (defining "person associated with a broker dealer" to include "any employee of such broker dealer"); *id.* § 80b-2(a) (defining "person associated with an investment advisor to include "any employee of such investment adviser"); *see generally* U.S.S.G. § 2B1.1, comment. (n. 15(A)) (defining "person associated with" a broker dealer or investment advisor for Guidelines persons with reference to the just-cited sections).  Thus, by its plain language, this enhancement applies to all five defendants.

Nonetheless, Joann Crupi, Jerome O'Hara, and George Perez contend that the enhancement does not apply to them because their responsibilities were "solely clerical or ministerial," within the meaning of the relevant statutes.  *See* 15 U.S.C. § 78c(a)(18); *id.* § 80b-2(a) (both containing such an exemption).  The terms "clerical" and "ministerial" are not further defined in the statute, but giving them their ordinary meaning, *see Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its

---

[17]    Madoff Securities registered as an investment advisor in 2006, but the SEC retains regulatory authority over unregistered investment advisors.  That is why, for example, in explaining the elements of falsifying the books and records of a broker-dealer, the Court explained that the jury needed to find "that Madoff Securities was a registered broker-dealer," but the element of falsifying the books and records of an investment advisor required the jury only to find "that Madoff Securities was a registered or unregistered investment advisor."  (Tr. at 12000).

ordinary or natural meaning"), there is no credible argument that any of these defendants had functions that were "solely clerical or ministerial."  *See, e.g.,* Black's Law Dictionary (8th ed. 2008) (defining "ministerial act" as: "An act performed without the independent exercise of discretion or judgement."); Harper Collins English Dictionary (10th ed. 2009) (defining "ministerial" as "(of an office, duty, etc.) requiring the following of instructions, without power to exercise any personal discretion in doing so"); *see also Alloy Piping Prods., Inc. v. Kenzen Tetsu Sdn. Bhd.*, 334 F.3d 1284, 1289-90 (Fed. Cir. 2003) (surveying various dictionary definitions of "ministerial," all to similar effect); *cf. In re Soares*, 107 F.3d 969, 974 (1st Cir. 1997) ("when an official's duty is delineated by, say, a law or a judicial decree with such crystalline clarity that nothing is left to the exercise of the official's discretion or judgment, the resultant act is ministerial.").

Crupi admits, for example, that she "selected stocks and trades for some of the [Stanley] Chais accounts," (JC Mem. at 26), *i.e.*, the accounts for which every part of every transaction had to be profitable.  Even if it were true that Frank DiPascali reviewed all such trades – a proposition without support in the record – she would not be considered a "clerical or ministerial" worker by any definition.  Rather, she is describing the common Wall Street relationship between an analyst (who researches and proposes trades) and a portfolio manager (who has ultimate decision-making authority).  *See, e.g., Financial Careers: Analyst Jobs*, Investopedia, http://www.investopedia.com/university/financial-careers/financial-careers8.asp (last visited July 15, 2014 at 10:57 AM) ("If an analyst works for a

money management firm or hedge fund (the buy side) their job will entail recommending securities for sale or purchase by their portfolio managers."). A Wall Street analyst's duties are plainly not "solely clerical or ministerial."

O'Hara and Perez's contention that their duties were "solely clerical or ministerial" fares no better. It is undisputed that they were principally involved in writing tens of thousands of lines of bespoke computer code. Even if others within the firm – such as DiPascali or Enrica Cotellessa-Pitz – provided general directions to O'Hara and Perez about what they needed the programs to be able to do, there is no dispute that only O'Hara and Perez possessed the requisite technical knowledge to actually develop the programs and determined for themselves precisely how to accomplish the stated goals.

The evidence at trial, in fact, demonstrated that O'Hara and Perez continually updated and improved their software – such as through the addition of progressively more sophisticated pseudo-random number generators – on their own initiative. Moreover, after 2006, O'Hara and Perez had specific demands about how and when they would be involved in creating new software, including in their design of the "special advisory account programs," *i.e.*, CASH1750 and CASH1752 – the "special" program that O'Hara and Perez agreed to create, which allowed a user to manually manipulate the firm's books and records. (*See, e.g.,* Tr. at 5305 (DiPascali testifying that O'Hara and Perez created the programs after 2006 that "allowed information to be entered into the AS/400 in connection with the IA business"); Tr. at 7755, 8076-8106 (Diedrich testifying about functionality of CASH1750 and CASH

1752, including agreeing that CASH1750 functioned "just like" the other special programs in many respects)).

Moreover, O'Hara and Perez "continue[d] to consult with [DiPascali] on false documents that were being created and generated at Madoff Securities." (Tr. at 5306). At one point after 2006, O'Hara and Perez went out of their way to create a program that was precisely *not* what DiPascali wanted. (Tr. at 5309-10 (DiPascali testifying that he asked O'Hara and Perez to create a false stock record, and they did so but it was "out of balance." DiPascali asked "are you guys trying to be cute," to which O'Hara and Perez reiterated their "rules" about not leaving fingerprints in the computer system; *see also* Tr. at 5288 ("They said they didn't want their fingerprints on this crap any longer.")). They therefore cannot seriously argue that they were "without power to exercise any personal discretion" in the performance of their duties.

*    *    *

As a result of the Guidelines calculation set forth above, each defendant's offense level is 51, which is already well in excess of the maximum offense level contemplated by the Guidelines chart. Nonetheless, certain defendants should receive additional Guidelines enhancements, as well.

### 6.    Role in the Offense

Under section 3B1.1 of the Guidelines, "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." The Probation

63

Office recommends that Bonventre, Bongiorno, and Crupi qualify for this adjustment.  The Government agrees.

### a.      Daniel Bonventre, Annette Bongiorno, and Joann Crupi

In determining whether a defendant played a leadership role in a criminal organization, "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1 comment. (n. 4).  A "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  *Id.* § 3B1.1 comment. (n. 1).  "A defendant may be subject to a four-level enhancement" – and thus, necessarily, a three-level enhancement – even if the defendant managed only one other participant."  *United States v. Mi Sun Cho*, 713 F.3d 716, 722 (2d Cir. 2013).  In considering whether a scheme is "otherwise extensive" under Section 3B1.1(a), "all persons involved during the course of the entire offense are to be considered."  U.S.S.G. § 3B1.1 comment. (n. 3).

Here, there is no question that each of the defendants were part of a criminal organization with five or more participants.  In addition to the five defendants, *see United States v. Paccione*, 202 F.3d 622, 624-25 (2d Cir. 2000) (defendant is included in counting to five participants), the participants included at least the other defendants who have pleaded guilty to being part of the same criminal organization:

Bernard Madoff, Peter Madoff, David Friehling, David Kugel, Enrica Cotellessa-Pitz, Eric Lipkin, Irwin Lipkin, and Paul Konigsberg.

Bongiorno, for her part, does not contest application of this enhancement. (*See* AB Mem. at 12). Bonventre and Crupi do protest, but their arguments are unavailing. Bonventre managed numerous criminally responsible participants: he supervised the criminal conduct of, at various point, Jerome O'Hara (with respect to DTC reports and the general ledger), Enrica Cotellessa-Pitz (regardless of whether he was her "supervisor" on the Madoff Securities organizational chart, Bonventre directed her involvement in the creation of fake general ledgers, stock records, and other documents), Joann Crupi (in connection with the '703 account), and David Friehling (in connection with tax audits). As set forth above, there is simply no question that Bonventre was part of Madoff's "inner circle," and was in a leadership position in the criminal conspiracy.

Crupi's supervisory role was more circumscribed, but she certainly had managerial responsibility over various other employees of the investment advisory business. (*See, e.g.*, Tr. at 408, 4260). The Government agrees, however, that Crupi's supervision of unwitting participants in the fraud – though highly relevant to her role in the offense and thus her ultimate sentence – does not make her a "manager or supervisor" for purposes of Section 3B1.1. *See, e.g., United States v. Skys*, 637 F.3d 146, 158 (2d Cir. 2011). But aside from the people that she formally supervised, Crupi also directed various of her co-conspirators at certain times in connection with certain projects, and that *does* suffice for the enhancement. For

example, Crupi, along with DiPascali, directed the names of foreign financial institutions for O'Hara and Perez to insert into the account titles of customer statements to make the RVP/DVP format statements for the 2004 so-called "Swanson audit." (Tr. at 5015-17). And in the days before Madoff's arrest in December 2008, Crupi, along with DiPascali, directed Bongiorno to close out the investment advisory accounts of Madoff Securities employees and certain other investors, depleting the last of the funds in the '703 account. (*See* Tr. at 5467-70; *see also* GX 105-c141 (checks for the last of the fraud proceeds, found in Crupi's desk drawer)). Indeed, that DiPascali and Crupi agreed to lie to Bongiorno about why this was occurring illustrates persuasively that, by that time, Crupi had ascended to a managerial role.

It is irrelevant for purposes of Section 3B1.1 that she was not Bongiorno, O'Hara, or Perez's every day "supervisor," or even that they may have directed her from time to time. *See United States v. Brinkworth*, 68 F.3d 633, 642 (2d Cir. 1995). Section 3B1.1 requires only that "the defendant . . . exercise[ ] some control over others involved in the commission of the offense. . . ." *United States v. Mares-Molina*, 913 F.2d 770, 773 (9th Cir.1990) (cited in *Brinkworth*).

### d.   Jerome O'Hara and George Perez

Although the Probation Office does not recommend that O'Hara or Perez receive any sort of role adjustment for their participation in the fraud at Madoff Securities, both defendants contend that they qualify as "minor participants."

The Guidelines provide for a two-level reduction if the defendant was a "minor participant," defined as a defendant "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2(b) and comment. (n. 5). An adjustment under Section 3B1.2(b) is appropriate only when a defendant is "substantially less culpable than the average participant." U.S.S.G. § 3B1.2, comment. (n. 3(A)). A defendant has the burden of proving by a preponderance of the evidence that he is entitled to a mitigating role adjustment under Section 3B1.2 of the Guidelines. *See United States v. Yu*, 285 F.3d 192, 200 (2d Cir. 2002); *United States v. Castano*, 234 F.3d 111, 113 (2d Cir. 2000); *United States v. Colon*, 220 F.3d 48, 51 (2d Cir. 2000).

Whether a role adjustment is warranted is a "highly fact specific" inquiry that depends upon "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *United States v. Carpenter*, 252 F.3d 230, 234 (2d Cir. 2001) (internal quotation marks and citations omitted); *accord United States v. Ravelo,* 370 F.3d 266, 269-70 (2d Cir. 2004). In order to obtain a minor role adjustment, a defendant must establish not only that he is less culpable than others who were involved in the particular offense of conviction, but also that his culpability is minor in relation to the "average" participant in such a crime. *See United States v. Yu*, 285 F.3d 192, 200 (2d Cir. 2002) (quoting *United States v. Rahman*, 189 F.3d 88, 159 (2d Cir. 1999)); *see also United States v. Jeffers*, 329 F.3d 94, 103 (2d Cir. 2003). After all, "[i]f participation

67

in the offense were measured solely in relation to the co-defendants, the anomaly would arise that a deeply involved participant would be rewarded with a downward adjustment, just because his co-defendants were even more culpable." *United States v. Neils*, 156 F.3d 382, 383 (2d Cir. 1998). Thus, the sentencing court "is required to gauge the defendant's culpability relative to the elements of the offense of conviction as well as in relation to the co-conspirators." *Id.*

Applying these standards, O'Hara and Perez are not remotely "minor" participants. In the first place, Perez makes absolutely no attempt to meet his burden of demonstrating that he was a minor participant. (*See, e.g.,* Perez Objections to PSR at 8 (asserting that "[b]ased on his limited role at Madoff Securities, Perez is entitled to a 2 point reduction as a minor participant."). O'Hara does only slightly better, arguing that he was a "minor" participant because he "never participated in any management meetings" and because DiPascali testified that he was not alarmed when O'Hara claimed to refuse to do certain work. (JOH Mem. at 31-32).

At best, however, O'Hara's argument proves that he should not receive an aggravating role enhancement – a point the Government concedes. His arguments say nothing about whether he was a "minor" participant. Neither O'Hara nor Perez engage in any sort of discussion of where their conduct falls amongst that of their their co-conspirators. Indeed, O'Hara and Perez persist in declaring that they were not participants at all.

68

But it is plain that neither O'Hara nor Perez were substantially less culpable than the "average" participant in a Ponzi scheme.  Both were knowing participants in the fraud for approximately two decades.  During that time, they not only were integral to the continued operation of the fraud, including its massive expansion in the early 1990s, but they actively obstructed various investigations and examinations of Madoff Securities.  The average participant in a Ponzi scheme also does not get to name his own salary and bonus.  From their vantage point in Madoff Securities's computer systems – on both sides of the business, House 05 and House 17 – O'Hara and Perez had unique insight into the fraud, and played a unique role in it.  There is a reason, for example, that of all of the conspirators, it was DiPascali, Crupi, O'Hara, and Perez who stayed at the Plaza Athenee on the night before KPMG's audit of the firm in 2005, and who toasted to "fooling" or "tricking" the auditors.  They were at the very heart of the fraud.  Certainly, they were not minor participants in any sense of the word.[18]

### 7.    Obstruction of Justice

Finally, the Government submits that each of the five defendants should receive a two-level increase to their offense level because they "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense."  U.S.S.G. § 3C1.1.  This is so for two reasons.

---

[18]    In the context of the co-conspirators in this case alone, we also discuss below why O'Hara and Perez were both more culpable than Peter Madoff.

*First*, each of the defendants was involved in obstructive behavior during the course of the conspiracy, specifically with respect to audits and examinations of Madoff Securities by its primary regulator, the SEC. Bonventre, Crupi, O'Hara, and Perez were each convicted specifically of conspiracy, securities fraud, and falsifying the firm's books and records with respect to three SEC audits that took place in the mid-2000s. In addition, Annette Bongiorno – along with other defendants – was involved in similar obstructive behavior in the early 1990s in connection with the SEC's investigation of Madoff Securities following the collapse of Avellino & Bienes. Bongiorno also obstructed, or attempted to obstruct, a Department of Labor investigation into the ACF Money Service Pension Plan. This sort of core obstructive behavior is precisely the type of conduct that qualifies for a Guidelines enhancement under section 3C1.1 *See, e.g.,* U.S.S.G. § 3C1.1 comment. (n. 4 (listing "examples of the types of conduct to which this adjustment applies," including "producing . . . a false, altered, or counterfeit document or record during an official investigation")).

*Second*, as discussed further above, each of the five defendants engaged in other conduct designed specifically to obstruct the investigation and prosecution of this case. Annette Bongiorno and Daniel Bonventre lied when they testified in their own defense. Bongiorno and Crupi lied to the Government during proffers – in Crupi's case, after insisting that she was going to "stick to her story" rather than accept responsibility for her crimes. And O'Hara and Perez engaged in the most elaborate act of obstruction of all: their self-serving, self-addressed letters, written

70

more than two years before Madoff's arrest in an attempt to exculpate themselves when the inevitable happened. Bonventre, O'Hara, and Perez also submitted false letters to the Court in connection with their sentencings. For this conduct, as well, the defendants deserve a Guidelines enhancement.

### a.   Bongiorno and Bonventre's False Testimony

Bonventre and Bongiorno testified falsely. For that, they should receive an obstruction enhancement. *See* U.S.S.G. § 3C1.1 comment. (n. 4(B)). "To base a § 3C1.1 enhancement upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Pena*, No. 13-1787, __ F.3d __, 2014 WL 1797464, at *2 (2d Cir. May 7, 2014) (internal quotation marks and ellipsis omitted). The defendant's "intent to obstruct must be unambiguous," *id.*, and "[t]he enhancement may not be imposed if the false testimony may have been a result of confusion, mistake, or faulty memory," *id.* (internal quotation marks omitted); *see also id.* at *3-4 (reversing application of enhancement where statements made in declaration supporting suppression hearing were vague, may have been result of misunderstanding, or were not material). While the court need not make separate findings of fact, it must at a minimum make a finding that "the defendant knowingly made a false statement under oath." *United States v. Williams*, 79 F.3d 334, 337 (2d Cir. 1996) (internal quotation marks omitted); *see id.* at 337 (remanding based on insufficiency of district court's remark that adjustment was

warranted "based upon the whole record that I have seen and the testimony I have heard" (internal quotation marks and brackets omitted)); *see also United States v. Catano-Alzate*, 62 F.3d 41, 42 (2d Cir. 1995) (noting that "requirement of fact-finding insures that courts will not automatically enhance sentences whenever the accused takes the stand and is thereafter found guilty").

As described at length above, Bonventre and Bongiorno lied in numerous, specific ways.

### b.  Bongiorno and Crupi's False Proffers

Bongiorno and Crupi also lied earlier in the Government's investigation, during proffer sessions with the Government.  As set forth at length in the Government's motion *in limine*, (ECF No. 400), Crupi and Bongiorno both provided detailed and explicit denials of their involvement in criminal conduct at Madoff Securities, claiming that they believed all of the trading to be real, and to not have knowingly participated in any aspect of the fraud.[19]  These were, of course, lies. Both told more elaborate lies, as well.  For example, when confronted with her own note requesting a loss in her investment advisory account, (GX 105-c51, at p. 42), Crupi claimed that DiPascali had directed her to write the note.  And when confronted with her letters confirming the value of David Kugel's accounts to lenders, (GX 105-c143), she claimed that Kugel had directed her to write the letters. Crupi disclaimed any responsibility for any of her conduct at Madoff Securities.

---

[19]    The Government previously provided the Court with copies of the reports of these proffers, and can of course do so again if it would be convenient to the Court.

Moreover, both have effectively acknowledged that their proffers contained lies. Crupi expressly told DiPascali, after Madoff's arrest, that she intended to "stick to [her] story" – meaning that the investment advisory trades were being processed by the market making business. (Tr. at 5495). And immediately after her own proffer, Annette Bongiorno made a point of visiting David Kugel in person to let him know that she had lied and not told the Government that he had been the source of information for many of the fake trades. (Tr. at 2113-14).

### c.    O'Hara and Perez's Self-Addressed, Sealed Letters

Finally, the Government submits that O'Hara and Perez's September 2006 letters to themselves warrant an obstruction enhancement. The letters are nothing less than false exculpatory evidence planted by the defendants years in advance for their inevitable day in Court. It is obstruction of the worst kind. O'Hara and Perez's continued insistence on referring to these letters and their associated demand that they "didn't want their fingerprints on this crap any longer," (Tr. at 5288), as "act[s] of great courage," (GP Mem. at 24), is just another example of their failure to accept the jury's verdict and take any responsibility for their actions.

The Government agrees entirely that the "obvious purpose of the letter[s] was to be opened in the event something happened to" O'Hara or Perez; they were "'open in the event of emergency' letter[s]." (GP Mem. at 25). But it is equally obvious what the "emergency" contemplated by O'Hara and Perez was: the inevitable collapse of the Ponzi scheme.

O'Hara and Perez wrote those letters and mailed them to themselves as an insurance policy, for when the firm collapsed and Madoff was arrested, to offer as false proof that they had refused to participate in the fraud.[20]  Why else did they keep the letters for two years after they wrote them, long after it was plain they wouldn't be fired?  Why else did they not open the letters immediately or turn them over to law enforcement, but held on to them to use as defense exhibits?  Why else did they not voice their "discomfort" to a single person other than DiPascali and Madoff – to whom they complained in order to get raises and bonuses that were nothing less than "hush money"?  Why did O'Hara and Perez both express dismay when Haresh Hemrajani helped the trustee's staff, and why did O'Hara expressly tell him not to?

Just as Bonventre had concocted an explanation that he planned to (and did) give to regulators or law enforcement when the fraud collapsed, (*see* Tr. at 5302), O'Hara and Perez's letters were part of their own "exit strategy" – all hatched in late 2006, when the firm was registering as an investment advisor and Madoff was being called in to testify before the SEC, and the end seemed as if it might be near.

---

[20]     Perez claims that DiPascali knew about the letter.  (GP Mem. at 25).  Although that point is ultimately irrelevant, it also is not true.  Although there is literally some evidence in the record to support that point – because DiPascali misunderstood a question on direct examination – the record is equally clear that DiPascali did not, in fact, know that Perez and O'Hara had written those letters.  (Tr. at 5496 (answering "No" to the question "did Mr. Perez ever tell you that he wrote a letter to himself and mailed it to himself," and the same answer as to O'Hara)).  We highlight this only because it is another instance in which the defendants are making jury arguments based on selective quotations of the record, rather than addressing the core conduct for which they were convicted.

The Court should consider O'Hara and Perez's orchestrated obstruction when it sentences them.

### 8. The Court Should Not Depart From the Guidelines Range

Finally, in the event that the Court agrees with the calculations in the PSRs, several of the defendants invite the Court to depart from the relevant Guidelines ranges because of "double-counting." This argument is without merit.

In the first instance, after including all of the relevant offense level enhancements, all five of the defendants are so far above the top of the Guidelines range that even if the Court were to depart 10 levels – which it plainly shouldn't – they would still be at level 43. This argument is therefore entirely academic.

But more fundamentally, there is no unwarranted double-counting here. "[A] district court calculating a Guidelines sentence may apply multiple Guidelines provisions based on the same underlying conduct where that is the result clearly intended by Congress and the Sentencing Commission." *United States v. Maloney*, 406 F.3d 149, 153 (2d Cir. 2005). Under the Guidelines, "[t]he offense level adjustments from more than one specific offense characteristic within an offense guideline are applied cumulatively (added together) unless the guideline specifies that only the greater (or greatest) is to be used."). U.S.S.G. § 1B1.1 comment. (n. 4(A)). "Impermissible double counting is the *judicial* augmentation of a defendant's sentence in contravention of the applicable statute or Sentencing Guideline." *United States v. Meskini*, 319 F.3d 88, 91 (2d Cir. 2003) (emphasis in original).

The fraud Guidelines expressly delineate when two enhancement should not be applied simultaneously given the risk of cumulative effects.  *See, e.g.,* U.S.S.G. § 2B1.1, comment. (n. 4(D)) (stating that enhancement for vulnerable victims should not be applied if the enhancement for more than 50 victims is applied); U.S.S.G. § 2B1.1, comment. (n. 7(E)) (stating that enhancements for abuse of trust under U.S.S.G. § 3B1.3 should not be applied if the enhancement for certain misrepresentations under U.S.S.G. § 2B1.1(b)(8)(A) is applied); U.S.S.G. § 2B1.1, comment. (n. 8(C)) (stating that if the conduct that supports an enhancement for sophisticated means is the same conduct that supports an enhancement for obstruction of justice, the court should apply only the sophisticated means enhancement).  By contrast, the enhancements recommended in the PSR are not alternative enhancements and can thus be counted together without being cumulative.[21]

In *United States v. Sabhnani*, 599 F.3d 215. 250-52 (2d Cir. 2010), the Second Circuit held that the application of two Guidelines enhancements, namely an enhancement for use of a dangerous weapon and another enhancement for causing serious bodily injury, did not constitute impermissible "double counting," or

necessitate a "cumulative effects" departure.  The Court rejected the defendant's

claims that the application of both of the enhancements was cumulative because the

serious bodily injury in question was actually caused by the dangerous weapon

used.  In reaching this conclusion, the Court held that multiple adjustments are

properly imposed when they aim at different harms emanating from the same

conduct.  *See id.* at 251.  Specifically, the Court, citing *United States v. Rappaport*,

999 F.2d 57, 60 (2d Cir. 1993), noted that enhancements are not duplicative when

they reflect "different facets of the defendant's conduct."  *Sabhnani*, 599 F.3d at 251.

Similarly, each of the enhancements recommended in the PSRs is based on a

different aspect of the criminal scheme and serves entirely distinct purposes. For

example, the sophisticated means enhancement applies here because the scheme

involved "especially complex or especially intricate" conduct.   By contrast, the

number of victims enhancement reflects an incremental increase in punishment

that is warranted where so many victims are injured by the criminal scheme, while

the enhancement for the defendants' managerial role (where appropriate) reflects

an incremental (and deserved) increase in punishment to reflect that the defendant

---

[21]    Indeed, the Guidelines expressly explain that with respect to the
enhancements applied here, they *can* be applied simultaneously, but to a somewhat
limited extent.  That is why, for example, the defendants do not receive the full
four-level enhancement for substantially endangering the solvency or financial
security of 100 or more victims, pursuant to U.S.S.G. § 2B1.1(b)(16)(B).  Rather,
because the defendants also received a six-level enhancement for number of victims,
the fraud Guideline expressly provides that only two additional points can be
applied under this subsection.  *See id.* § 2B1.1(b)(16)(C) (providing that the
maximum combined offense level adjustment for number of victims and for
endangering the solvency of 1,000 or more victims is eight).

played such an important and central role in the scheme.  Thus, application of each of the enhancements would not unfairly double count for the same conduct.  *See United States v. Kilkenny*, 493 F.3d 122, 131 (2d Cir. 2007) (because they serve different purposes, application of enhancements for (i) having derived more than $1 million dollars from a financial institution, and (ii) loss amount enhancement is not impermissible double counting even though "there is a substantial overlap between the two enhancements"); *United States v. Kentz*, 251 F.3d 835, 843 (9th Cir. 2001) ("Enhancing for the amount of monetary loss, degree of planning, mass marketing, victimizing vulneral1le victims during telemarketing, and impacting a large number of vulnerable victims . . . accounts for different aspects of the harm that [defendant's] conduct caused."); *United States v. Orr*, 567 F.3d 610, 616 (10th Cir. 2009) ("[T]he calculation of 'loss' for purposes of § 2B1.1 is a 'distinct concept' from the identification of 'victims' for purposes of § 2B1.1 . . . ." (quoting *United States v. Conner*, 537 F.3d 480, 491 n.38 (5th Cir. 2008))); *see also Maloney*, 406 F.3d at 149 ("[A] district court calculating a Guidelines sentence may apply multiple Guidelines provisions based on the same underlying conduct where that is the result clearly intended by congress and the Sentencing Commission.  While such calculations may involve 'double counting' in a literal sense, they do not involve impermissible double counting.  Moreover, we have consistently held that double counting is permissible in calculating a Guidelines sentence where . . . each of the multiple Guidelines sections applicable to a single act serves a distinct purpose or represents a discrete

harm."). As a result, no cumulative effects departure is warranted. Indeed, as we discuss below, if anything an upwards departure would be warranted.

**B.      The Defendants Should be Sentenced to Significant Terms of Imprisonment**

Consideration of the statutory sentencing factors in this case demands that each of the five defendants be sentenced to a significant term of imprisonment. They each knowingly and willfully participated in one of the world's largest frauds, and they must receive a sentence that accounts for their conduct, and that deters others from falling prey to the same impulses.

**1.      The Nature and Circumstances of the Offense**

The defendants' very serious crimes had the effect of perpetuating and concealing a multi-billion dollar fraud scheme that victimized thousands of investors – a fraud in which investors suffered an actual loss of at least approximately $20 billion.

For many reasons, the defendants' crimes call for severe punishment. Their crimes involved ongoing and systematic deception; for years, they repeatedly lied to investors, regulators, auditors, and banks. The defendants – all of them – falsified literally millions of pages of documents  and engaged in a series of almost comic efforts to further the fraud. Ordinary people and sophisticated investors alike relied on documents created by the defendants – all of them – in making important life decisions. Some people retired because they thought their money was safe. Others bought a home.

All of them lost everything. Charities collapsed. University endowments shrank overnight. Pension plans (including state-run pension plans) lost millions upon millions. Any *one* of these five defendants could have stopped it decades ago. Instead, they chose to personally profit.

Indeed, the defendants' crimes were not born of economic necessity. At no point was their criminal conduct the result of any financial duress. Nor were the defendants' crimes one-time events arising from financial pressure or bad judgment. Rather, they were calculated and well thought-out over the course of years. At all times, it was within the defendants' power to stop their own crimes, as well as the entire fraud.

References to the victims' enormous losses simply does not capture the harm to them. It is essential that the voices of the victims of the defendants' crimes not be forgotten during sentencing. By way of illustration, the Government refers the Court to the many victim impact statements submitted in *United States v. Bernard L. Madoff*, 09 Cr. 213 (DC).[22] As they demonstrate, the conspiracy perpetrated through Madoff Securities by these defendants and others wiped out the resources of many families – resources that, in some instances, represented generations of hard work and savings.

---

[22]    On Monday, the Government will file copies of all victim impact statements received in connection with the Madoff Securities investigation, including the statements submitted in connection with Bernard Madoff's sentencing.

Examining even a handful of letters and statements submitted by the victims of Madoff Securities paint a bleak picture of the terrible impact the defendants' crimes had on thousands of people.  Here are some examples:

- A victim from Florida:  "We have lived [here] for 20 years where my husband owns a small real estate company . . . Prior to the loss of our money, we were using some of it to help pay some of our larger bills because the real estate market here was, and remains a disaster, and at times my husband wasn't making enough money to cover all our living expenses . . . At this point in time we have minimal health insurance and try to maintain good habits so we don't get sick and have to spend money we don't have . . . The loss of this money has ripped us apart emotionally, as well as financially, and we put our lives on HOLD . . . [but] we will survive and forge ahead with our future plans."  (Victim E-Mail, dated June 20, 2011);

- Another victim:  "The impact for me of this crime has been the necessity in my late 60's to work [a] minimum of 32 hours a week and [to] continue this for as long as I am able.  I do not have the option to think of retirement . . . [My financial well-being is] significantly compromised.  I am of the age that I . . . have no opportunity to regroup this loss.  I have sought to live within my means and be conservative.  My hope was to have a financial buffer which I no longer have.  I have manifest concerns about my future."  (Victim Impact Statement, dated August 3, 2011).

- Attorney Working *Pro Bono* on Behalf of Victims:  "The lives of all of the people whose retirement depended upon their Madoff investments have been decimated.  People in their 90's are being put in nursing homes for the first time in their lives because their children can no longer afford to maintain them in their private homes.  People in their 70's and 80's who retired with the assurance of a steady income from their Madoff accounts are being forced to sell their houses in a depressed market in order to have money to buy food."  (Letter from Helen Davis Chaitman, March 11, 2009);

- Another victim:  Because of their losses "[w]e have had to cut back on our charitable contributions . . . [but] [t]he biggest impact is yet to come.  When our granddaughter, who has Cystic Fibrosis, needs a lung transplant we had planned on paying for that.  Now, that is totally out of the question.  The impact this will have on our granddaughter is

81

unknown but it is likely to be extremely serious." (Victim Impact Statement, Undated);

- A victim from Colorado: "My father . . . and myself both had accounts with Bernard Madoff.  There were several members from our family who were affected by this tragedy . . . We had everything invested with Madoff.  Living only on the quarterly interest we received.  The loss of all our savings has devastated us.  We only have social security now and that puts us below the poverty line.  If we did not have some help from our relatives we would be on welfare.  Each day is a struggle to keep our heads above water." (Victim Letter, Undated).

The devastation caused by these defendants and their coconspirators is sweeping and, in many ways, unfixable.  And that makes the defendants' lack of contrition all the more galling.  At no point do any of the defendants' sentencing submissions even expressly acknowledge the impact of their crimes on the victims.  In essence, these defendants look upon the damage they and their co-conspirators have wrought and shrug their shoulders as if to say, "not my problem" – or worse, (*see* DB Mem. at 48 (comparing Bonventre to other victims of the fraud, and suggesting that Bonventre has already befallen a "worse fate")).  The defendants' attitude – particularly that of Bonventre, O'Hara, and Perez – is truly astonishing under the circumstances of this case and it is a factor in setting their sentences to which Government asks the Court to give considerable weight.

Given the extent of the deception perpetrated by the defendants and the harm to victims from their crimes, the Government respectfully submits that the nature and circumstances of their offenses warrant the imposition of a very severe sentence.

### 2.     The History and Characteristics of the Defendants

The defendants have all submitted extensive letters from friends and families attesting to their character.  We take no issue with any of that.  Humans are complicated, and the capacity of one person to be so extraordinarily generous while also committing such heinous crimes is almost unexplainable.  (*See, e.g.,* Tr. at 2649 (Eleanor Squillari, describing Bernard Madoff as a "generous boss" who was known for paying for employees' honeymoons); Tr. at 2850 (William Nasi, describing Bernard Madoff a "generous person" who purchased a machine that enabled him to read after he went legally blind); Tr. at 7550 (Craig Kugel, agreeing that Bernard Madoff was "generally good and generous with his employees"); Tr. at 9501 (Daniel Bonventre, testifying that Bernard Madoff was "generous, kind, considerate," and taught Bonventre "how to listen"); Tr. at 10198 (Annette Bongiorno, testifying that Bernard Madoff was a "very" generous person who arranged for medical care for her mother after a stroke); JC Mem. at 4 (describing Bernard Madoff's "kindness and generosity," including his "glowing recommendations" in support of Crupi's adoptive efforts).  The Court should certainly consider the defendants' personal history and characteristics when it fashions its sentences.

### 3.     The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

As described above, the defendants' conduct at trial and especially their sentencing submissions are remarkable not only for the absence of contrition or acceptance of responsibility, but their absolute scorn for the jury's verdict and

unwillingness to confront reality. The argument – made by many of the defendants – that they have already been "punished" by the loss of their jobs, money, and reputations rings hollow because they do not view those things as "punishment" at all. They view them as injustices, heaped upon them for no good or fair reason.

The five defendants – most notably Bonventre, O'Hara, and Perez – have consistently demonstrated their disrespect for the law, not only by committing horrible crimes, but by disrespecting the criminal justice system. A very significant sentence is necessary in order to not only reflect the seriousness of the defendants' offenses, but to promote respect for the law.

### 4.    General and Specific Deterrence

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), also must be considered. Here, the Government respectfully submits that a significant term of imprisonment is necessary to serve the purposes of deterrence.

The crimes committed through Madoff Securities have shaken investor confidence and endangered the financial stability of numerous institutions and individuals. The deterrent message and effect of the sentence imposed by the Court in this case will resonate significantly with any individual or institution tempted to engage in similar conduct. (*See* DB Mem. at 1 ("The sentences of Daniel Bonventre and his former colleagues . . . will [not] be overlooked," but will "be immediately announced in headlines and recalled in the community for years")). The need for deterrence is especially important at smaller institutions like Madoff Securities – a

private company – where individuals may operate under the mis-impression that they are "under the radar," and can avoid scrutiny or significant jail terms.

The defendants contend that the loss of their reputation and finances is sufficient to deter them and others from further misconduct.  But that is simply not the case.  As the Court cogently explained in sentencing Peter Madoff:

> The Court is also very much aware that [the defendant] and his family have lost the assets, reputation, financial security and social position that they had enjoyed.  The negotiated and indeed Draconian forfeiture agreement seals [the defendant's] financial ruination.  That punishment while indisputably severe is not alone sufficient to effect a punishment that is just, given the nature, magnitude and context of the crimes for which [the defendant] is being sentenced today.

> Many people and institutions have suffered the same fall from wealth, privilege and in many cases even basic levels of financial security as a result of the massive fraud.  Ordinary wage-earning people who had planned for ordinary comfortable retirements are among the victims here too. . . .

> Proper punishment also requires a lengthy term of imprisonment, the punitive loss of [the defendant]'s personal freedom.  Such a sentence is also necessary to serve the deterrence function of sentencing.  I am persuaded that [the defendant] himself will not reoffend.  He has been hurt too badly and brought his family down too low to go the route of dishonest business practices again.  However, the world in which his conduct took place is full of many temptations and opportunities to breach trust relationships for personal gain.

> The consequences of such behavior must be harsh to help deter others from taking the path of dishonesty and theft.  Sentencing consistency also guides this Court strongly in the same direction.

(Peter Madoff Sentencing Tr. at 28-29).

The Government agrees entirely with the Court's reasoning, and believes it applies with equal, if not greater, force to these defendants.

**5.    The Kinds of Sentence and Sentencing Range Established**

The Court must also consider "the kinds of sentence and the sentencing range established" in the Guidelines.  18 U.S.C. § 3553(a)(4).  As set out above, the Guidelines for each of the five defendants call for a sentence at the combined statutory maximum of their offenses of conviction.  Thus, this factor plainly weighs in favor of a very significant sentence, although, as we explain further below, the Government does not insist that the defendants receive Guidelines sentences.

Certain of the defendants (and the amici) spend significant space arguing whether the fraud Guidelines are based on "empirical evidence" or at unduly driven by loss amount.  This argument is misguided in the context of the sentence of these five defendants, for two reasons.  *First*, the attack on the fraud guideline is itself misguided; the current fraud Guideline is the result of extensive and iterative work by the Sentencing Commission, and is based on sound policy choices.  *Second*, even if the fraud Guidelines are overly reliant on loss – a point the Government does not concede – the defendants' conduct in this case is serious by every other measure.

The defendants in essence mount a challenge to Section 2B1.1 "based solely on policy considerations."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  There are three major lines of cases criticizing specific Guidelines under *Kimbrough*.  The first line of authority relates to Section 2D1.1, the drug

Guidelines, as applied to offenses involving crack cocaine. *See Kimbrough v. United States*, 552 U.S. at 109. The second involves the Guidelines relating to child pornography, Section 2G2.2. *See United States v. Dorvee*, 616 F.3d 174, 183-84 (2d Cir. 2010). And the third relates to Section 2B1.1, the Guideline at issue here. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd,* 301 Fed. Appx. 93 (2d Cir. 2008).

Although the Second Circuit has endorsed policy-level challenges to the Guidelines in cases involving crack and child pornography, it has explicitly not done so with respect to Section 2B1.1. *See United States v. Goffer*, 721 F.3d 113, 131 (2d Cir. 2013) ("Defendants in this case assert that several district court judges have chosen to exercise this ability to issue below-Guidelines sentences to white collar criminals. [The defendants] raise broad questions as to how harsh federal courts are, and how harsh they should be, in sentencing white collar defendants. We need not answer either question.").[23]

In *Kimbrough*, the Supreme Court held that Section 2D1.1 was subject to policy-level disagreement by district courts in cases involving crack because the Commission had merely adopted, without deliberation, the 100-1 crack to cocaine

---

[23] As several defendants note, Judge Underhill expressed similar concerns in a concurrence he authored while sitting by designation. *See United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013). Notably, however, the Court's per curiam decision in *Corsey* does not even mention these concerns. To the contrary, the Court suggested that the Guidelines themselves properly account for situations in which the loss amount may overstate the serious of the offense, such where – as in *Corsey* – the intended loss was massive, but not remotely likely. *See id.* at 377 (citing U.S.S.G. § 2B1.1, application note 19(c), which permits a downward departure where the offense level "substantially overstates" the seriousness of the offense).

ratio that Congress enacted in the Anti-Drug Abuse Act of 1986.  *See Kimbrough*, 552 U.S. at 96.  The *Kimbrough* Court also noted that the Commission "later determined that the crack/powder sentencing disparity is generally unwarranted." *Id.* at 97.  In *Dorvee*, the Second Circuit expressed concern that Section 2G2.2 had been increased largely by congressional fiat in the PROTECT Act, and that the Commission "has often openly opposed these Congressionally directed changes" to the child pornography Guidelines.  *Dorvee*, 616 F.3d at 184-85.

The Commission's development of Section 2B1.1 is not subject to the same degree of criticism.  Over a five-year period between 1996 and 2001, the Commission engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses, with the involvement of relevant stakeholders including the defense bar, the Department of Justice, probation officers, and the U.S. Judicial Conference.  *See* Federal Register Notice BAC2210-40, 62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment regarding economic crime sentencing reform).  The resulting amendments were referred to as the "Economic Crime Package," and they became effective on November 1, 2001.  *See* Sentencing Guidelines for the United States Courts, 66 Fed. Reg. 30,512, 30,540 (June 6, 2001). The Commission explained the amendments to Section 2B1.1 as follows:

> [M]ost fraud statutes cover a broad range of conduct with extreme variation in severity.  The specific offense characteristics and cross references contained in this guideline are designed with these considerations in mind.

> The Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses

88

> should reflect the nature and magnitude of the loss caused or intended by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.

Id. at 30,533. Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the Commission, following a collaborative process with relevant stakeholders, that loss amount should be a central consideration in determining the seriousness of an offense to which that Guideline applies.

In 2002, Congress instructed the Commission to amend the Guidelines for white-collar crime again, this time as part of the Sarbanes-Oxley Act. Congress's instructions at that time were far more open ended than the congressional mandates regarding Section 2G2.2 in the PROTECT Act.[24] In emergency amendments promulgated pursuant to Sarbanes Oxley in January 2003, the

---

[24] *Compare* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 905(b), 116 Stat. at 805 ("[T]he Sentencing Commission shall . . . ensure that the sentencing guidelines and policy statements reflect the serious nature of the offenses and the penalties set forth in this Act, the growing incidence of serious fraud offenses . . . and the need to modify the sentencing guidelines and policy statements to deter, prevent, and punish such offenses."), *with* Pub. L. No. 108-21, § 401(b), 117 Stat. 650 (2003) (subsection titled "Conforming Amendments To Guidelines Manual"), and *Dorvee*, 616 F.3d at 185 (explaining that, in the PROTECT Act, Congress "(i) adopted sentencing reforms without consulting the Commission, (ii) ignored the statutorily-prescribed process for creating guideline amendments, (iii) amended the Guidelines directly through legislation, (iv) required that sentencing data be furnished directly to Congress rather than to the Commission, (v) directed the Commission to reduce the frequency of downward departures regardless of the Commission's view of the necessity of such a measure, and (vi) prohibited the Commission from promulgating any new downward departure guidelines for the next two years" (internal quotation marks omitted)).

Commission modified the loss-amount enhancement in Section 2B1.1 for high-loss

cases — that is, cases involving loss amounts in excess of $200 million. *See* U.S.

Sentencing Comm'n, Emergency Guidelines Amendments, 15 Fed. Sentencing

Reporter 281, 283 (Apr 1, 2003) ("[T]he amendment expands the loss table at

§2B1.1(b)(1) to punish adequately offenses that cause catastrophic losses of

magnitudes previously unforeseen, such as the serious corporate scandals that gave

rise to several portions of the Act."), *available at* 2003 WL 22016909.   Following a

period of notice and comment, *see* 68 Fed. Reg. 2615, *available at* 2003 WL 131508,

the Commission conducted hearings on the amendments in March 2003, *see* U.S.

Sentencing Comm'n, Hearing on Amendments in Response To Sarbanes-Oxley, 15

Fed. Sentencing Reporter 291 (Apr. 2003), *available at* 2003 WL 22016911.

The hearings included testimony from the chair of the Sentencing Guidelines

Subcommittee of the Attorney General's Advisory Committee; the co-chairs of the

Commission's Practitioners Advisory Group; the president of the National

Association of Criminal Defense Lawyers; and Professor Frank Bowman. *See id.* at

291.   Thus, as with the Economic Crime Package amendments, the final

amendments to Section 2B1.1 following Sarbanes Oxley were the product of

deliberation by the Commission rather than rote application of a congressional

mandate.   To the extent Section 2B1.1 emphasizes loss amount to the degree it

does, that was an intentional decision by the Commission based on years of

consideration and guidance from Congress. *See United States v. Ebbers*, 458 F.3d

110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the

appropriate national policy for [white collar] crimes."). The defendants' criticism of the fraud Guidelines should be rejected.

But whatever the merits of their argument generally, this case is a particularly poor vehicle through which to make it. While reasonable minds can disagree about the precise workings of the fraud Guidelines and whether they are unduly driven by loss, no one would argue that the size and scope of a financial fraud should be *unrelated* to the resulting sentence. Certainly, the amici do not make that argument, *see* Amicus Mem. at 10 ("amici urge that the court give appropriate consideration to the amount of the loss in this case"). It stands to reason that a defendant who engages in a longer, bigger fraud involving more victims should be punished more harshly than a defendant who engages in a single deceit, defrauding a single victim of a small amount of money.

But these defendants engaged in the longest, biggest fraud of all time; by any measure, their crimes were historic. By dollars, the loss amount was at least approximately fifty times the top of the Guidelines range. And this was not merely the "loss amount," it was the amount of money actually *stolen* from investors. Thus, this case – and other Ponzi scheme cases – is unlike the fraud in *Adelson* and many other securities fraud cases, where the "ordinary measure of loss" is "the decline in the price of stock when the fraud is revealed." 441 F. Supp. 2d at 506. In such a case, the losses and the defendants' conduct may be quite distinct.[25] Here, by

---

[25]   For example, Bonventre cites Judge Gertner's decision in *United States v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010). (*See* DB Mem. at 25). But in that case, the $20 billion loss figure was purely a measure of intended loss in a credit card

contrast, the loss is simply the amount of money that the defendants stole from their victims as of the time that the fraud collapsed. Indeed, the Guidelines commentary suggests that in a case like this one, an *upwards* departure may be appropriate. *See* U.S.S.G. § 2B1.1, comment. (n. 20(A)) (upwards departure may be appropriate where the "offense caused or risked substantial non-monetary harm," such as "psychological harm, or severe emotional trauma," or where the "offense created a risk of substantial loss beyond the loss determined for purposes of subsection (b)(1), such as a risk of significant disruption of a national financial market").[26]

Even applying the amici's proposed alternative formulation, *see* Amicus Mem. at 9, the defendants would deserve significant terms of imprisonment. They willfully participated in an outright theft of billions of dollars from thousands of victims over decades; they did it for no other reason than to profit; they employed sophisticated and devious means in furtherance of their crimes; and they repeatedly

---

fraud, for which the Guidelines prescribe that each credit card is presumptively worth $500 in loss. The defendant, who was subject to a 60 month statutory maximum and received a sentence of 24 months' imprisonment, "made nothing from the scheme." (Bonventre's citation to *Watt* also misleadingly suggests that Judge Gertner was critical of the fraud Guidelines, quoting her as saying they were "of no help" and "almost irrelevant." But this was not a criticism of the Guidelines, it was merely recognition of the fact that the Guidelines range was so far and above the statutory maximum.)

[26]    For the same reason, Bonventre's bizarre suggestion that the magnitude of the fraud warrants a downward departure because it is "outside of the heartland of investor fraud" is misplaced. (*See* DB Mem. at 37). To the extent the defendants' crimes were outside of the heartland, an *upwards* departure would be appropriate. But, of course, such a departure would be academic here.

took steps to obstruct and impede investigations into their crimes.[27]

### 6.    The Need to Avoid Unwarranted Sentencing Disparities

Finally, the Court must consider the need to avoid unwarranted sentencing disparities.  Although, as Judge Chin recognized, no other scheme to defraud can be compared to this one in terms of its size, scope, and duration, courts *have* recently sentenced defendants in other billion-dollar-plus investment frauds.  The sentences in those cases have been far more significant than the defendants portray.

The Government submits that other Ponzi scheme cases, and not the hodge-podge of white collar sentences illustrated in the defendants' submissions, is the relevant body of cases to evaluate.  *See* 18 U.S.C. § 3553(a)(6) (courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

### a.    A Significant Term of Imprisonment is Consistent With Sentences in Other Ponzi Scheme Prosecutions

For example, in the fraud perpetrated through Stanford International Bank, R. Allen Stanford was sentenced in June 2012 to 110 years in prison for orchestrating the fraud, which involved losses in excess of $5 billion over the course of approximately 20 years.  Stanford was not the only defendant convicted and

---

[27]    In discussing the kinds of sentence available, Bonventre also points to the costs of imprisonment.  As the Second Circuit recently made clear, this is not an acceptable consideration at sentencing, even as part of the section 3553(a) analysis. *See United States v. Park*, __ F.3d __, 2014 WL 3289493, at *3 (2d Cir. July 9, 2014) ("the cost of incarceration to the government . . . is not a relevant sentencing factor under the applicable statutes. . . .  [B]ased on the plain language of § 3553(a), no sentencing factor can reasonably be read to encompass the cost of incarceration.").

sentenced in that investigation, however.  In addition to Stanford, the District Court in Texas sentenced at least two other defendants to 20-year terms of imprisonment:  Gilbert Lopez, Jr. (age 70) and Mark Kuhrt (age 40).  And James Davis (age 64), a cooperating witness, was sentenced to five years' imprisonment after receiving the benefit of a 5K1.1 motion.  *See United States v. Stanford, et al.*, No. 09 Cr. 342 (S.D. Tex.); *United States v. Davis*, No. 09 Cr. 335 (S.D. Tex.); *see also* Former Executives of Stanford Financial Group Entities Sentenced to 20 Years in Prison for Roles in Fraud Scheme*,* http://www.fbi.gov/houston/press-releases/2013/former-executives-of-stanford-financial-group-entities-sentenced-to-20-years-in-prison-for-roles-in-fraud-scheme (last visited July 16, 2014 at 2:00 PM).[28]

Other significant Ponzi scheme prosecutions have likewise resulted in significant terms of imprisonment, even for defendants who accepted responsibility for their conduct.  *See, e.g., United States v. Scott Rothstein*, 09 Cr. 60331 (S.D.F.L.

---

[28]    An additional Stanford-related defendant, Laura Pendergest-Holt, pleaded guilty to a single count of obstructing the investigation into Stanford International Bank.  Although Pendergest-Holt was not convicted of participating in the underlying fraud itself, she was sentenced to three years' imprisonment.  *See United States v. Stanford, et al.*, No. 09 Cr. 342 (S.D. Tex.).  Two other Stanford-related defendants were acquitted.  *See United States v. Perraud and Raffanello*, No. 09 Cr. 601029 (S.D. Tex.).

2010) (50 years for $429 million scheme with 250 victims);[29] *United States v. Robert Stinson*, 10 Cr. 724 (E.D.P.A. 2012) (33 years for $14 million scheme); *United States v. John Mattera*, 12 Cr. 127 (S.D.N.Y. 2013) (11 years for $13 million scheme). Ponzi defendants who, like the defendants here, proceeded to trial have received much stiffer sentences for significantly smaller loss amounts.  *See, e.g., United States v. Stitsky*, No. 06 Cr. 357 (KMW) (S.D.N.Y. 2010) (85 years for $23 million scheme with more than 250 investors); *United States v. Edward Okun*, 08 Cr. 132 (E.D. Va. 2009) (100 years for $126 million scheme); *United States v. Richard Harkless*, 07 Cr. 18 (C.D.C.A. 2009) (100 years for $39 million scheme with 600 victims).  Where defendants have gone to trial in cases involving larger amounts, the sentences have been much higher and, at times, astronomical.  *See, e.g., United States v. Weiss*, 98 Cr. 99 (M.D. Fla. 2009) (835 *year* sentence for $125 million fraud).[30]  Even judges who have been extremely critical of the fraud Guideline have recognized that Ponzi scheme cases pose different concerns, and that very high

---

[29]    According to public documents, Rothstein began cooperating with the Government prior to his sentencing, but did not plead guilty pursuant to a cooperation agreement or receive the benefit of a 5K1.1 motion.  Shortly after he was sentenced to 50 years' imprisonment, the Government filed a protective Rule 35 motion, which it asked the Court to immediately stay.  Rothstein's cooperation appears to be ongoing, as he testified as recently as at the trial of a co-conspirator earlier this year.  The Government has indicated that when his cooperation is complete, and assuming Rothstein testified truthfully and otherwise complies with his agreements with the Government, it will pursue the Rule 35 motion and advise the sentencing court of the nature, extent, and value of the defendant's cooperation.

[30]    Weiss, who received 835 years, was the lead defendant.  Other defendants in the same case received sentences of 740 years (Keith Pound) and 294 months (Jan Schneiderman).

sentences may sometimes be appropriate.  *See, e.g., United States v. Marc Dreier*, 09
Cr. 85 (JSR) (S.D.N.Y. 2009) (20 years for $700 million fraud).

Indeed, in 2013 alone, more than 50 defendants in Ponzi scheme cases were
sentenced to 10 years or more in prison; approximately fourteen defendants were
sentenced to 20 years or more.  *See* Database of 2013 Ponzi Schemes: Sentenced,
http://www.ponzitracker.com/2013-ponzi-schemes/ (last visited July 17, 2014, at
10:49 AM).  The longest sentence handed down in 2013 was to Karen Bowie (age
61), who received an 80 year sentence for playing a *supporting role* – Bowie did not
even deal directly with investors – in a $4.7 million Ponzi scheme that victimized 30
investors.  *See* Valerie Wigglesworth, *Maine Woman Gets 80-Year Sentence for
Swindling Investors Through Plano's Titan Wealth*, Dallas Morning News, available
at http://crimeblog.dallasnews.com/2013/02/maine-woman-gets-80-year-sentence-
for-swindling-investors-through-planos-titan-wealth.html/ (last visited July 17,
2014, at 10:55 AM).

The database, which provides hyper-link citations to public sources for each
case, contains what appears to be a relatively comprehensive list of all significant
(more than $1 million) Ponzi schemes uncovered since approximately the time of
Bernard Madoff's arrest.  *See* http://www.ponzitracker.com/ponzi-database/.  A
review of the complete database shows numerous defendants sentenced to decades
in prison.  By comparison, only a handful of defendants appear to have been
sentenced to home confinement or probation, at least some as a result of cooperating

with authorities.[31]  Suffice it to say, none of them participated for decades in a multi-billion dollar Ponzi scheme.

The suggestion by certain defendants in this case that they should receive home confinement or probation is therefore grossly inconsistent not only with the sentences received by culpable defendants in other cases, but it is inconsistent with peripheral players in those investigations – and ones who accepted responsibility for their conduct, to boot.

> **b.    A Significant Term of Imprisonment – Certainly More Than the 10 Year Sentence Received by Peter Madoff – is Consistent with the Defendants' Culpability in this Case**

Indeed, the best comparison for the conduct in this case are the other defendants who have already been sentenced for their roles in the fraud at Madoff Securities.[32]  One of those people is Bernard Madoff, who received a sentence of 150 years in prison.  The Government of course agrees that Madoff is culpable in a way different in kind from any other participant in this fraud, and that none of the five

---

[31]    *See, e.g.,* Sean Longoria, *10 Years in Prison, Harsh Words for Ponzi Scheme Sentenced in Plea Deal*, Record Searchlight, *available at* http://www.redding.com/news/10-years-in-prison-harsh-words-for-ponzi-scheme (last visited July 17, 2014, at 11:09 AM) (reflecting that Jeffrey A. Guidi – who is reflected in the Ponzi scheme database as receiving a sentence of "0" – "agreed to plead no contest to a California corporations code misdemeanor and agreed to cooperate with state prosecutors in their case, including testifying against his two former co-defendants").

[32]    The Government is aware that Section 3553(a)(6) was designed to guard against nation-wide sentencing disparities, rather than disparities within a single case.  *See United States v. Joyner*, 924 F.2d 454, 460 (2d Cir. 1991).  Nonetheless, the Court is certainly permitted to look to the sentences received by others in the same case when determining the defendants' sentences.  *See, e.g., United States v. Goffer*, 721 F.3d 113, 130 (2d Cir. 2013); *see also* JC Mem. at 11 (noting that all of the conspirators in this case "have different levels of culpability").

defendants should receive a sentence greater than his, even though that is what the Guidelines recommend.

But the other sentenced defendant – Peter Madoff, who pleaded guilty and received a sentence of ten years in prison – is a more instructive example.  In the Government's view, each of the five defendants convicted in this case is more culpable than Peter Madoff, and should be sentenced to a longer term of imprisonment.  That is so for principally two reasons.

*First*, Peter Madoff accepted responsibility – legally, if not morally – for the conduct with which he was charged.  Although the Court plainly did not credit everything in Peter Madoff's allocution – particularly his contention that he did not know anything was wrong in the investment advisory business, (*see* Peter Madoff Sentencing Tr. at 28 ("It is also, frankly, not believable")) – there is no dispute that he pleaded guilty and acknowledged that he had committed multiple serious crimes, including securities fraud.

The defendants in this case, on the other hand, have not accepted responsibility for any of their crimes in any sense, and instead portray themselves as victims.  Some, like Joann Crupi, have simply exercised their right to go to trial.  But certain of the defendants have done something quite remarkable.  Not only have they not accepted responsibility, but they have done the opposite:  they have not only maintained their innocence, but they have continued to protest that their convictions were the result of "persecute[ion]," (DB Mem., Exh. 16), that the Government "exaggerated and twisted the evidence," (Letter of George Perez dated

98

June 16, 2014, at 2), and "lost its moral compass," (GP Mem. at 2), whereas the defendants themselves are "pure of heart," (DB Mem. at 37), rather than criminals. As discussed above, this extraordinary lack of remorse not only makes a significant sentence very important to instill respect for the laws and deter further misconduct, but it is a critical point of differentiation between these defendants and Peter Madoff – whom victims of the crime were at least able to hear him say that he was "profoundly sorry" for his actions.  (*Id.* at 22).

*Second*, the underlying offense conduct of each of the five defendants here was, in the Government's estimation, worse than Peter Madoff's conduct – although Peter Madoff undoubtedly played a critical role in perpetuating the fraud at Madoff Securities.  Unlike the defendants here, who were active participants in the fraud for decades, Peter Madoff's active participation came much later, at or about the time the firm registered as an investment advisor in 2006.  Prior to 2006, because the investment advisory business was unregistered, the SEC conducted no examinations specifically of that business, and there was no formalized compliance program for the investment advisory business to speak of.  When the firm began to plan to register as an investment advisor, it needed to have an actual compliance program, including a compliance officer and compliance policies, including reviews of trading.  Peter Madoff, who was the lead compliance officer for the firm, took on those responsibilities.

But he did so in name only; of course, Peter Madoff conducted no trading reviews of Madoff Securities, because there was no trading.  But he falsified

documents saying that he had conducted them, and that the firm was in compliance

with applicable laws and regulations, such as the trading reviews themselves, as

well as annual reports required under Rule 206(4)-7 of the Investment Advisors Act

and NASD Rules 3012 and 3013.  Peter Madoff was also responsible for

understating and misrepresenting the scope of the investment advisory business in

the paperwork submitted to the SEC in connection with the firm's registration, *i.e.*,

the Form ADV.  (Just prior to the firm's registration, he also participated in the

destruction of e-mails responsive to a 2005 SEC examination of the firm).  In

December 2008, with the firm on the verge of collapse, Peter Madoff also assisted in

deciding which employees and other investors would receive the last of the funds in

the '703 account – a process that Joann Crupi helped with.[33]  Finally, Peter Madoff

participated in a tax fraud in connection with various transfers of money from the

firm to himself and others.  *See generally* Information, *United States v. Peter

Madoff*, S7 10 Cr. 228 (LTS).

    This was remarkably serious conduct.  Through these actions, Peter Madoff

unquestionably facilitated the fraud, and he did so by falsifying compliance

documents and submissions to the SEC and other regulators.  The ten year sentence

---

[33]    Strictly speaking, Bongiorno helped as well.  But the evidence at trial established that Bongiorno was not told the true reason for liquidating the employees' accounts and distributing the last of the funds in the '703 account.

he received was richly deserved.[34]

In many ways, Peter Madoff's conduct was similar to David Friehling's. Just as Peter Madoff falsified compliance documents when in fact he had done no compliance review, Friehling falsified audited financial statements when in fact he had done no audits. (*See* Tr. at 3011 (Friehling testifying that he was guilty of securities fraud because he "was not doing a proper GAAP and GAAS audit and my statement was being given to Bernard L. Madoff, who then was using that statement to give to banks for loan purposes and to investors for investor purposes")). Regulatory filings, compliance documents, and audited financials are all necessary documents to authenticate an investment advisor. Without those documents, the fraud could not have persisted.

As serious as Peter Madoff's crimes were – particularly for a lawyer and a man of status within the securities industry – each of the five defendants here engaged in more serious, multi-faceted, longer-term offense conduct. Unlike Peter Madoff, each of the five defendants here had insight into the inner-workings of the fraudulent investment advisory business, including the '703 account through which the Ponzi scheme was run. Each of the five defendants here knew, beyond a

---

[34]      *See generally* Peter Madoff Sentencing Tr. at 25 ("The guidelines sentence here is life imprisonment. It is literally off the sentencing guidelines chart. The government and the defense, however, have negotiated a carefully crafted set of charges and a guilty plea agreement under which the maximum possible sentence of imprisonment is ten years. Thus the question with which this Court has to wrestle is not whether a sentence longer than ten years is called for but rather whether anything less than ten years could appropriately serve the statutory purposes of sentencing.").

reasonable doubt, that the trading in the investment advisory business was non-existent, and that investor redemptions were being paid with other people's money. Unlike Peter Madoff, who did so only after the firm registered as an investment advisor, each of the defendants here participated in creating false documents designed to fool regulators and investors for *decades*. Indeed, they spent significant time and energy attempting to fool the SEC in a bid to avoid having to register in the first place.

Simply put, each of the five defendants here willfully furthered the Ponzi scheme at Madoff Securities for decades, defrauding thousands of victims out of billions of dollars. Their conduct, by any measure, was more serious than Peter Madoff's very serious conduct. The five defendants here absolutely must, in the Government's view, receive harsher sentences in order to reflect their relative culpability.

In the Government's estimation, for their forty year involvement at the very heart of the fraud, Bonventre and Bongiorno are the most culpable of the five defendants here; indeed, they are second-only to Bernard Madoff himself, and on a par with Frank DiPascali. Crupi, who joined later but took on an active and ambitious role in the fraud, is next. O'Hara and Perez, whose insight into the inner-workings of the fraud gave them a unique view into its scope and mechanics – and so for whom the argument that Madoff Securities was "highly compartmentalized" has least resonance, (JOH Mem. at 35) – are only slightly less culpable than Crupi. In sum, the Government believes that each of the five

defendants should receive a significant sentence. To be certain, each of the defendants should receive a more severe sentence than Peter Madoff, who both was less culpable, and who took some responsibility for his misconduct.

*     *     *

In view of all of the facts and factors set out above, the Government believes these five defendants are each deserving of a severe sanction, proportionate to their roles in this historic fraud. While a Guidelines sentence – which in several cases would be longer even than the sentence imposed on Bernard Madoff himself – is not necessary, the Government urges the Court to impose sentences that will send a powerful signal to the defendants that they must respect the law; to others who might be tempted to engage in financial misconduct that the consequences will be severe; and to the thousands of victims that the conduct here was remarkably serious.

## C.   The Defendants Should Be Denied Bail Pending Appeal

The defendants seek bail pending appeal, so that they may remain at liberty after the Court imposes sentence. The Government strongly objects.

The standards governing bail pending appeal are set forth in Section 3143(b) of Title 18, United States Code, which provides that a judicial officer "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the judicial officer finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released," and

103

> that the appeal is not for the purpose of delay and raises a
> substantial question of law or fact likely to result in B (i)
> reversal, (ii) an order for a new trial, (iii) a sentence that
> does not include a term of imprisonment, or (iv) a reduced
> sentence to a term of imprisonment less than the total of
> the time already served plus the expected duration of the
> appeal process.

18 U.S.C. § 3143(b).  That provision gives effect to Congress's view that "'once a

person has been convicted and sentenced to jail, there is absolutely no reason for the

law to favor release pending appeal or even to permit it in the absence of

exceptional circumstances.'"  *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985)

(quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)).  Following a guilty

verdict and sentencing, there is a "presumption in favor of detention."  *United

States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).  It is the defendant's burden

to "rebut that presumption with clear and convincing evidence."  *Id.*

As defined by the Second Circuit, a "substantial question" is "one more of

substance than would be necessary to a finding that it was frivolous.  It is a close

question or one that very well could be decided the other way."  *United States v.

Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (citation and internal quotation marks

omitted).  "If a court does find that a question raised on appeal is 'substantial,' it

must then consider whether that question is 'so integral to the merits of the

conviction on which defendant is to be imprisoned that a contrary appellate holding

is likely to require reversal of the conviction or a new trial.'"  *Id.* at 125 (quoting

*United States v. Miller*, 753 F.2d at 23).  With respect to these issues, "the burden of

persuasion rests on the defendant."  *Id.*

There is no "substantial question" of law or fact presented in this case for purposes of bail pending appeal.  The defendants were convicted by overwhelming evidence.  In addition, the defendants point to no undecided questions of law that are "so integral to the merits of the conviction" that a contrary holding by the Court of Appeals would require reversal of their numerous convictions; indeed, their post-trial motions were notable for the absence of any serious legal dispute.

These defendants were convicted of numerous serious crimes, based on hundreds of exhibits and weeks of credible testimony.  In addition, should the Court impose a substantial prison sentence, it would create a powerful incentive for the defendants to flee.  That of course weighs against the defendants' request, as well, as well.  Accordingly, the Government submits that the defendants should be denied bail pending appeal, and should be required to report promptly to the custody of the Bureau of Prisons.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully requests that
the Court sentence Daniel Bonventre, Annette Bongiorno, Joann Crupi, Jerome
O'Hara, and George Perez to significant terms of imprisonment consistent with
their respective roles in the offense.

Dated:      New York, New York
            July 18, 2014

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney
                         Southern District of New York

            By:     /s/ Matthew L. Schwartz
                    MATTHEW L. SCHWARTZ
                    JOHN T. ZACH
                    RANDALL W. JACKSON
                    Assistant United States Attorneys